**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Morris D. ENGLISH, Jr., Defendant–
Appellant.**

No. 94–50415.

United States Court of Appeals,
Ninth Circuit.

Submitted Nov. 14, 1995.*

Decided Aug. 9, 1996.

* The panel unanimously finds this case suitable for decision without oral argument. Fed. R.App. P. 34(a) and Ninth Circuit Rule 34–4.

Morris D. English, Jr., Safford, Arizona, Pro. Per.

Peter S. Spivack, Assistant United States Attorney, Los Angeles, California, for plaintiff-appellee.

Before FLETCHER, CANBY and HAWKINS, Circuit Judges.

MICHAEL DALY HAWKINS, Circuit Judge:

Appellant Morris D. English, Jr. ("English") was indicted on allegations that he had used his company, The Wellington Group, Inc. ("Wellington"), to defraud hundreds of investors of millions of dollars. English was convicted at trial of mail fraud, securities fraud, money laundering, and criminal contempt. English raises seven arguments on appeal, relating to errors he alleges were made by both his counsel and the trial court. English argues that (1) emotional testimony from one of the government's witnesses requires a mistrial, (2) the district court's decision to permit a witness who had observed some of the proceedings to testify despite the court's general witness exclusion order, was an abuse of discretion,

(3) a juror's ex parte contact with a spectator requires reversal of all of his convictions, (4) the district court's failure to instruct on the "willfulness" requirement found in the penalty provision of the fraudulent sale of securities statute requires reversal of his securities fraud convictions, (5) the government failed to link all the money involved in the money laundering offenses to English's illegal activity as required by the money laundering statute, (6) the district court abused its discretion by imposing an $881,-000 restitution order, and (7) his trial counsel rendered ineffective assistance. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), and we affirm.

## I. FACTS AND PROCEEDINGS BELOW

English's conviction and appeal arise out of his activities as President, Chief Executive Officer, and sole shareholder of Wellington. From 1985 to approximately 1991, English, through his company, was purportedly in the business of raising capital to fund loans to be used in the acquisition and development of condominium projects. English's activities were actually designed to swindle millions of dollars from investors. English made false representations to investors regarding the security and intended use of their Wellington investments. He would typically represent to the investors that their funds were to be used for condominium development loans or other short-term, high interest loans. The loans, English told the investors, were secured by a fractionalized interest in a trust deed recorded against the borrower's property. He would then either take the investor's money and never make the promised loan, or make the loan but never pay the investors their principal and interest once the condominium units had been sold. The government contended that English defrauded more than 1,500 victims who lost $30,000,000 or more through this scheme.

English was eventually indicted for his Wellington activities. In its final form,[1] the indictment totaled forty-seven counts, includ-

---

1. The original, fifty-one count indictment was replaced by a superseding indictment on September 23, 1993.

ing eleven counts of mail fraud, fifteen counts of securities fraud, fifteen counts of money laundering, five counts of bankruptcy fraud, and one count of criminal contempt.[2] On May 16, 1994, after a six week trial and five weeks of jury deliberations, English was convicted on six counts of mail fraud, eight counts of securities fraud, ten counts of money laundering, five counts of bankruptcy fraud, and one count of criminal contempt. He was acquitted on two counts of mail fraud, and a mistrial was declared on the remaining counts after the jury failed to reach a unanimous verdict.

The district court sentenced English to 216 months in prison. The court also ordered English to pay $881,000 in restitution to nine victims of his fraudulent activities. The district court denied English's post-trial motions for judgment of acquittal and for a new trial. English timely appealed.[3]

## II. DISCUSSION

### A. Emotional Testimony From One Of The Government's Rebuttal Witnesses

#### Standard of Review

A district court's denial of a motion for a mistrial is reviewed for an abuse of discretion. *United States v. George*, 56 F.3d 1078, 1082 (9th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 351, 133 L.Ed.2d 247 (1995). Under this standard, the reviewing court cannot reverse unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclu-

sion it reached upon a weighing of the relevant factors. *Washington State Dep't of Transp. v. Washington Natural Gas Co.*, 59 F.3d 793, 805 (9th Cir.1995).

#### Analysis

During a sidebar conference at trial, English's attorney moved for a mistrial based on the testimony of government witness Stanley Sokol. Mr. Sokol, an investor who had been defrauded by English, referred to the emotional impact of the financial losses on his wife. English contended the testimony may have impermissibly affected the jury's verdicts by playing on the jurors' emotions and sympathy. The court denied the motion for a mistrial.[4]

The district court did not abuse its discretion in denying the motion for a mistrial. Although the court acknowledged that Mr. Sokol's testimony had been emotional, the court denied the motion because the challenged testimony was the inadvertent result of the witness' "emotional collapse," and the "real damaging ... fact that Ms. Sokol took her own life as a result of this unfortunate financial transaction" had not come out. *Cf. United States v. Lewis*, 787 F.2d 1318, 1324–25 (9th Cir.1986) (denial of mistrial for arguably prejudicial testimony not error in part because testimony was "uninvited, unanticipated statement by a prosecution witness"). The court instructed the government to again admonish Mr. Sokol not to "blurt out anything other than a direct response to the question," and suggested that the govern-

---

**2.** The government later dismissed four counts of mail fraud.

**3.** In addition to the seven claims discussed below, English raised two additional claims on appeal. First, English asserts that the district court improperly seated an alternate juror after deliberations had begun without first seeking English's consent pursuant to Fed.R.Crim.P. 24(c). During jury deliberations, a juror had to be excused for medical reasons. The district court replaced that juror with an alternate and instructed the jury to start its deliberations over again. Because this argument was raised for the first time in English's reply brief, we decline to consider this issue. *See In re Food Catering & Housing, Inc.*, 971 F.2d 396, 397 n. 1 (9th Cir. 1992).

English also contends that the government improperly introduced English's immunized testimony from prior bankruptcy proceedings into his criminal trial in violation of 11 U.S.C. § 344. However, English's bankruptcy testimony was never immunized. Thus, his argument regarding the improper use of his bankruptcy testimony is without merit. *See* 11 U.S.C. § 344 (immunity attaches to bankruptcy testimony when government grants it).

**4.** English also contends that the testimony of Mrs. Mosorosky, another investor defrauded by English, warrants a mistrial. The defense did not make a motion for mistrial at the time of Mrs. Mosorosky's testimony, and a review of the record does not support English's claim on appeal. Thus, we reject English's challenge to the testimony of Mrs. Mosorosky.

ment have Mr. Sokol identify the financial documents and then "get rid of Mr. Sokol and get to the next witness." The district court's decision to instruct the government to limit Mr. Sokol's responses rather than grant a mistrial was not an abuse of discretion.

## B. Decision To Permit Witness To Testify Despite Court's General Witness Exclusion Order

### Standard of Review

 A district court's decision to permit a witness to testify notwithstanding the court's general sequestration order is reviewed for an abuse of discretion. *United States v. Hobbs,* 31 F.3d 918, 921 (9th Cir. 1994). "A witness is not [automatically] disqualified merely because he remains in the courtroom after a sequestration order." *United States v. Oropeza,* 564 F.2d 316, 326 (9th Cir.1977), *cert. denied,* 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978). In fact, disqualification is "strongly disfavored." *Hobbs,* 31 F.3d at 921.

### Analysis

Before trial, the district court issued the standard order excluding all potential witnesses from the courtroom during trial. English contends that the district court erred when it allowed a witness who had sat in the courtroom during earlier proceedings to testify over defense objections. The witness, Murray Lawther, was a Wellington investor who testified during the government's rebuttal regarding misrepresentations English had made to him.

 The district court did not abuse its discretion by deciding not to disqualify Mr. Lawther from testifying. One factor given considerable weight in determining what sanction, if any, is appropriate for the violation of a sequestration order is whether the side calling the witness deliberately violated the court's order. *See, e.g., Hobbs,* 31 F.3d at 922–23 ("no evidence before the district court that defense counsel had acquiesced in the witnesses' violation"); *United States v. Gibson,* 675 F.2d 825, 836 (6th Cir.) (whether

party seeking the testimony knew of sequestration violation is an important factor in determination of appropriate sanctions), *cert. denied,* 459 U.S. 972, 103 S.Ct. 305, 74 L.Ed.2d 285 (1982).

 Although the government in this instance may have known Mr. Lawther was in the courtroom during some of the trial, there is no indication that the prosecution intended to violate the court's order. Rather, the prosecution had not expected to call Mr. Lawther to the stand at all, but changed its mind after hearing English testify.[5] Moreover, English does not indicate how, if at all, he was prejudiced by the introduction of Mr. Lawther's testimony. *See, e.g., United States v. Brewer,* 947 F.2d 404, 410–11 (9th Cir.1991)(applying harmless error analysis to review of failure to exclude witnesses from courtroom).

In light of the absence of governmental misconduct and of a showing of prejudice, the court's decision to limit Mr. Lawther to rebutting testimony of English rather than disqualifying Mr. Lawther altogether was not an abuse of its discretion.

## C. Juror's Ex Parte Contact With Spectator

### Standard of Review

 To obtain a new trial, the defendant must establish that actual prejudice resulted from an ex parte contact with a juror. *United States v. Madrid,* 842 F.2d 1090, 1093 (9th Cir.), *cert. denied,* 488 U.S. 912, 109 S.Ct. 269, 102 L.Ed.2d 256, 257 (1988). We are required to assume that the jury followed any curative instruction given by the court unless there is admissible evidence to the contrary. *United States v. Brady,* 579 F.2d 1121, 1127 (9th Cir.1978), *cert. denied,* 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1979).

### Analysis

 English contends that the jurors were prejudiced by ex parte contact with investors who had been defrauded by English. Only one incident of ex parte contact with a juror was ever brought to the atten-

---

**5.** The government told the court that Mr. Lawther "didn't become relevant as a rebuttal witness

until Mr. English testified on cross [regarding misrepresentations made to investors]."

914

tion of the court.[6] The court noted immediately before beginning jury instructions that

> it was brought to my attention that some of the spectators coming up the elevator made a comment to one of the jurors—oh, all the jurors were on the elevator. You are to disregard any comments made to you by any persons, just like you are to disregard any newspaper articles and/or radio or television broadcasts. And I warn the people outside in the audience that to interfere with the judicial process and to communicate with a juror is a criminal offense.

English not only presents no evidence that the brief interaction in the elevator prejudiced the jury, but also does not demonstrate why the curative instruction was inadequate. A mistrial is clearly not appropriate.

### D. Failure To Instruct On "Willfulness"

*Standard of Review*

Whether a jury instruction misstates elements of a statutory crime is a question of law and is reviewed de novo. *United States v. Von Willie,* 59 F.3d 922, 927 (9th Cir.1995). When there is no objection to jury instructions at the time of trial, we will review only for plain error. *United States v. Ponce,* 51 F.3d 820, 830 (9th Cir.1995).

*Analysis*

English was convicted for securities fraud under 15 U.S.C. § 77q(a) and 15 U.S.C. § 77x. Section 77q(a) makes it illegal to use instruments of interstate commerce to defraud or deceive purchasers of securities. Section 77x, a general penalty provision covering § 77q(a) and other 15 U.S.C. § 77 offenses, provides that "[a]ny person who *willfully* violates" § 77q(a) is subject to fines and incarceration. 15 U.S.C. § 77x (emphasis added). Thus, while § 77q(a)'s definition of the substantive offense of securities fraud does not include a willfulness requirement,

§ 77x, the penalty provision applicable to the substantive offense, does.

English notes that the district court did not define "willful" or in any other respect instruct the jury that § 77x requires proof that the defendant knew that his actions were illegal. He asserts that the district court's failure to instruct the jury that the "willfulness" language of § 77x requires the government to prove that defendant knew he was violating the law was reversible error under *Ratzlaf v. United States,* 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994).[7] We disagree.

In *Ratzlaf,* the defendant was convicted for substantive offenses defined under 31 U.S.C. § 5324(a)(3), which prohibits the structuring of financial transactions for the purpose of evading a bank's reporting requirements. Section 5324(3), in turn, was subject to a general penalty provision that exposed a "person *willfully* violating" § 5324(3) to criminal penalties. 31 U.S.C. § 5322. (emphasis added) The Supreme Court held that the jury must be instructed that unless it determines that the defendant "willfully" violated § 5324(3) by engaging in currency transactions defendant knew to be illegal, the defendant has to be acquitted.

The Supreme Court rested its decision on three grounds. First, it reasoned that by deciding not to give independent significance to § 5322(a)'s "willfully violating" clause, the lower court had "treated § 5322(a)'s 'willfulness' requirement essentially as surplusage." *Ratzlaf,* 510 U.S. at 140, 114 S.Ct. at 659. Second, the Court explained that the courts of appeals consistently had interpreted the willfulness language in provisions related to § 5324(3) to require a showing that the defendant understood that his or her activity was illegal. *Id.* at 140–44, 114 S.Ct. at 659–60. Third, the Court stated that the act of structuring currency transactions is not "so obviously 'evil' or inherently 'bad' that the

---

**6.** English's broad assertion of impermissible ex parte contact amounts to little more than a claim that because the jurors and the investors often used the same hallways, prejudicial interaction must have occurred. English did not, however, ask the judge for an evidentiary hearing regarding ex parte contact and can cite no example of juror-investor contact. Thus, English has simply failed to establish that any contact has occurred, much less that any juror-investor contact resulted in actual prejudice.

**7.** *Ratzlaf* was handed down on January 11, 1994. The district court delivered its instructions to the jury on February 4, 1994.

'willfulness' requirement is satisfied irrespective of the defendant's knowledge of the illegality of structuring." *Id.* at 146, 114 S.Ct. at 662.

Although § 77q(a) and § 77x are structurally comparable to the offenses under review in *Ratzlaf,* the similarity ends there. First, unlike cases examining § 5324(3), cases addressing §§ 77q(a) and 77x have not required proof of knowledge of illegality. In *United States v. Brown,* 578 F.2d 1280 (9th Cir.), *cert. denied,* 439 U.S. 928, 99 S.Ct. 315, 58 L.Ed.2d 322 (1978), for example, we focused on the effect the willfulness requirement of § 77x had on one element of a § 77q(a) violation, namely the defendant's mens rea regarding the status of the "securities" he was offering for sale. We held that "the use of the word 'willful' as employed in 15 U.S.C. § 77x does not import [into 77q(a)] a requirement of specific knowledge that an instrument [used in the fraud] is a security as defined in the Act." *Id.* at 1285.

Although our holding in *Brown* was limited to the issue of whether the defendant had to know the relevant financial instruments were securities, we did discuss whether § 77x generally requires that the government prove a § 77q(a) defendant had knowledge of illegality. We implied that § 77x does not add a knowledge element to § 77q(a), stating that § 77q(a) is not "a trap for the unwary because the thrust of it is fraud." *Id.* at 1284. Since fraud is an inherently bad act, we concluded, there is no danger of prosecuting "the innocent, feckless, or reckless" under 77q(a) and 77x. *Id.* at 1283. Thus, without explicitly deciding the issue, we came very close in *Brown* to declaring that § 77x does not require a specific intent to break the law.

Neither have we established knowledge of illegality as an element of English's offense in other cases in which we have reviewed § 77q(a) convictions for sufficiency of the evidence. Although we have cited evidence of a purpose to disobey the law to support our sufficiency findings, *see United States v. Kessi,* 868 F.2d 1097, 1104 (9th Cir.1989)(noting that defendant "had stated that he knew that his actions might violate the law" in support of sufficiency of evidence on intent to defraud), we have never required that the government establish knowledge of illegality. *See United States v. Boone,* 951 F.2d 1526, 1537 (9th Cir.1991) (reviewing sufficiency of evidence on intent without mentioning willfulness requirement or requiring specific intent to break the law); *United States v. Mayo,* 646 F.2d 369, 371–72 (9th Cir.) (same), *cert. denied,* 454 U.S. 1127, 102 S.Ct. 979, 71 L.Ed.2d 115 (1981). Thus, rather than evincing a consistent interpretation of § 77x that introduces a willfulness requirement into § 77q(a) offenses, our cases, especially *Brown,* support the conclusion that §§ 77q(a) and § 77x do not require proof of knowledge of illegality.[8]

Moreover, unlike the currency transaction violations at issue in *Ratzlaf,* there can be no doubt about the inherently nefarious nature of English's fraudulent scheme. *See Brown,* 578 F.2d at 1284 (implying that willfulness was not a required element of a conviction under §§ 77q(a) and § 77x in part because § 77q(a) is not "a trap for the unwary because the thrust of it is fraud"). Limiting *Ratzlaf* to offenses that are not malum in se is consistent with *United States v. Baker,* 63 F.3d 1478 (9th Cir.1995), *cert. denied,* ——

---

8. A review of the decisions of other circuits reveals that § 77x's willfulness requirement is generally ignored in § 77q cases. *See, e.g., United States v. Rogers,* 960 F.2d 1501, 1511 (10th Cir.) (ignoring § 77x's willfulness requirement), *cert. denied,* 506 U.S. 1035, 113 S.Ct. 817, 121 L.Ed.2d 689 (1992); *United States v. Rubin,* 836 F.2d 1096, 1102–03 (8th Cir.1988) (examining the scienter requirement for offenses under §§ 77q(a) and 77x without mentioning willfulness requirement); United States v. Boyer, 694 F.2d 58, 59–60 (3d Cir.1982)(same).

Courts that have construed § 77x have not given "willfulness" a consistent meaning. *Compare, e.g., Arthur Lipper Corp. v. SEC,* 547 F.2d

171, 181 n. 7 (2d Cir.1976) (noting that "a finding of actual knowledge [of the law violated] is not necessary for finding criminal liability under [§ 77x] of the Securities Act for 'willful' violations of … § 77q"), *cert. denied,* 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978), *with United States v. Gentile,* 530 F.2d 461, 470 (2d Cir.) (holding that a district court's knowingly and willfully instructions under § 77q(a) and § 77x "adequately advised the jury that each defendant had to have actual knowledge he was participating in a crime before he could be convicted"), *cert. denied,* 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976).

U.S. ——, 116 S.Ct. 824, 133 L.Ed.2d 767 (1996), where we held that *Ratzlaf* did not apply to 18 U.S.C. § 2342, which makes it "unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes." Our analysis in *Baker* relied exclusively on our determination that § 2342 is not a complicated statute that could trap the unwary innocent. After noting that the *Ratzlaf* Court was concerned with criminalizing innocent behavior, we concluded that because § 2342 is not "so complex so as to create the danger of innocent violation ... conviction under [§ 2342] does not require proof that a defendant knows his conduct violates the law." *Baker*, 63 F.3d at 1493.

In sum, the Court in *Ratzlaf* was concerned not only about the structure of § 5524(3), but also with how the statute had been interpreted by the courts and whether the criminal activity was "obviously evil." In this case, our interpretation of the relationship between § 77q and § 77x, combined with the fraudulent nature of English's activity, distinguishes English's claim from *Ratzlaf*. Accordingly, we hold that the omission of a willfulness instruction did not constitute *Ratzlaf* error.

### E. Source Of The Money Involved In The Money Laundering Charges

#### *Standard of Review*

■ We review de novo the question whether 18 U.S.C. § 1956(a) requires the government to prove that all the funds in a bank account that was the subject of a money laundering charge were derived from illegal activity. *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 783 (9th Cir.1995).

#### *Analysis*

■ English contends that because the government did not trace all the proceeds involved in the § 1956 money laundering counts to unlawful activity, his money laundering convictions must be reversed. We disagree.

English's contention that we have not addressed this issue is erroneous. In *United States v. Garcia*, 37 F.3d 1359 (9th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1699, 131 L.Ed.2d 562 (1995), we addressed the government's burden under the money laundering statute. We held that "under the money laundering statute [18 U.S.C. § 1956], due to the fungibility of money, it is sufficient to prove that the funds in question came from an account in which tainted proceeds were commingled with other funds." *Id.* at 1365. The government established during trial that the money laundering transactions charged in the indictment involved accounts that included the proceeds of unlawful activity; even English does not appear to dispute that at least some of the funds involved in the money laundering counts were derived from English's investment scheme. Because *Garcia* clearly controls, we reject English's § 1956(a) argument.

### F. The District Court's Restitution Order

#### *Standard of Review*

■ A district court's restitution order is reviewed for abuse of discretion. *United States v. Rice*, 38 F.3d 1536, 1540 (9th Cir.1994); *United States v. Woodley*, 9 F.3d 774, 780 (9th Cir.1993). The court has broad discretion in ordering restitution under the Victim and Witness Protection Act of 1982 ("VWPA"), 18 U.S.C. §§ 3663, 3664. *United States v. Miguel*, 49 F.3d 505, 510–11 (9th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2628, 132 L.Ed.2d 868 (1995).

■ In deciding what amount of restitution is appropriate under the Victim Witness Protection Act, the district court "shall consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." 18 U.S.C. § 3664(a). Although the VWPA "does not require express findings on these factors and grants the district court broad discretion in the kind and amount of evidence required," *United States v. Ramilo*, 986 F.2d 333, 335 (9th Cir.1993), the record must indicate that "the district court considered the defendant's future ability to pay."

*United States v. Bachsian,* 4 F.3d 796, 800 (9th Cir.1993), *cert. denied,* 510 U.S. 1080, 114 S.Ct. 901, 127 L.Ed.2d 92 (1994). Thus, while "indigence and a present inability to pay do not preclude imposition of restitution," *Miguel,* 49 F.3d at 511, a VWPA restitution order must be based on "some evidence the defendant may be able to pay the amount fixed when required to do so." *Ramilo,* 986 F.2d at 335.

### Analysis

During sentencing, the district court imposed $881,000 in restitution pursuant to the VWPA. The $881,000 figure represented the aggregated losses of nine Wellington investors. English asserts that the district court abused its discretion by entering the restitution order without considering English's future ability to pay restitution. The government contends that the court did consider English's future ability to pay, and also asserts that the record supports the district court's decision to impose restitution. We affirm the district court's restitution order.

■ The record demonstrates that the district court did consider English's ability to pay. Both the government and defense counsel addressed English's future ability to pay restitution during the sentencing hearing. Moreover, the Presentence Report, which the court indicated it had "read, reviewed, and considered," contained information regarding English's future ability to pay. *Cf. Bachsian,* 4 F.3d at 800 ("[T]he record reflects that the district court considered the presentence report in deciding whether to order restitution. Moreover, the presentence report contained information regarding the defendant's financial condition and his future ability to pay.").

■ The record also supports the district court's decision to impose $881,000 in restitution. Although English claimed indigence at sentencing, the district court noted that "he does have a history of being able to raise large sums of money. There's a lot of assets out there that are unaccounted for." During trial, the court heard testimony that English

had raised over forty-two million dollars in little over a year, and that one of English's investments had generated a profit of over eight million dollars. *Cf. Ramilo,* 986 F.2d at 336 (vacating restitution order in part because the record did "not indicate defendant's [past] money raising efforts met with success").

Moreover, English indicated that once out of custody, he expected to emerge quickly from indigence. Attached to the Presentence Report submitted to the court was a Personal Financial Statement filled out by English to assist the Probation Department in evaluating his finances. On page three of that statement, English indicated that "prospect of an increase in value of assets or in present income" was "excellent if not incarcerated." The PSR also documents English's ability to raise large amounts of money in short periods of time.[9] The record provided ample support for the district court's decision to impose restitution despite English's indigence.

English relies primarily on *Ramilo* in support of his restitution argument. In *Ramilo,* we reversed a district court's $455,000 VWPA restitution order, which was to be paid within three years after the defendant's release from prison, because the record indicated the district court had not considered the defendant's future earnings potential. The defendant had an annual income of approximately $30,000 before his arrest, and was married with six dependent children. *Ramilo,* 986 F.2d at 334. We noted that although the defendant had attempted to raise large sums of money in the past, the record did "not indicate defendant's [past] money raising efforts met with success." *Id.* at 336. Moreover, the United States Attorney told the district court that the defendant was a "foreign national, who does face eventual exclusion from this country, and who ... cannot realistically be expected to make restitution to his victims or even to pay a significant fine." *Id.* at 337. Because the record lends much more significant support to the

---

9. This does not mean the district court was encouraging English to "rob Peter to pay Paul" as

there was evidence of English's legitimate fund-raising and profit-making abilities in the record.

district court's restitution order in this case, *Ramilo* is clearly inapposite.[10]

### G. Ineffective Assistance Of Trial Counsel

English asserts that he received ineffective assistance from his appointed counsel, Richard Callahan. English alleges (1) Mr. Callahan told him that he would not defend him if he "insist[ed] on going to trial," and (2) his counsel was incompetent and made poor decisions. Ineffective assistance claims are most appropriately raised in collateral habeas proceedings rather than on direct review because the appellate record often lacks an adequate evidentiary basis as to "what counsel did, why it was done, and what, if any, prejudice resulted." *See United States v. Molina*, 934 F.2d 1440, 1446 (9th Cir.1991).

We decline to address English's ineffective assistance claims on this record. A more developed record regarding the substance of English's claims and what, if any, prejudice resulted from his counsel's alleged deficiencies is required before a proper evaluation of English's ineffective assistance claim is possible.

AFFIRMED.

---

**10.** English also cites *United States v. Newman*, 6 F.3d 623, 631 (9th Cir.1993), and *United States v. Robinson*, 20 F.3d 1030, 1034 n. 5 (9th Cir.1994). In *Newman*, we reversed a district court's VWRA restitution order because the record "does not suggest any possibility" that the defendant could pay the amount of restitution ordered. As noted above, the record in this case does indicate a possibility that English could raise $881,000. *Robinson* only restates the *Ramilo* rule, and lends no significant support to English's argument.