**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Richard Harold STODDARD,
Defendant–Appellant.**

No. 97–10273.

United States Court of Appeals,
Ninth Circuit.

Submitted March 10, 1998.

Decided July 30, 1998.

**1142**

Michael J. Kennedy, Assistant Federal Defender, Sacramento, California, for Defendant–Appellant.

Mark J. McKeon, Assistant United States Attorney, Sacramento, California, for Plaintiff–Appellee.

Before: FERGUSON and THOMAS, Circuit Judges and MOLLOY,* District Judge.

MOLLOY, District Judge:

## I. Background

Richard Harold Stoddard ("Stoddard") was tried on a four count indictment stemming from his activities as a banker and land developer in California. A jury convicted him on two counts.[1] The jury could not decide on two counts and hung on charges of wilfully misapplying funds of a federally insured financial institution. The government dismissed both of these counts.

In this appeal, Stoddard claims there is insufficient evidence to support the jury verdict. He also challenges his sentence. We affirm the district court in all respects except the issue of restitution.

## II. Facts

Stoddard was a stockholder in Gold River Federal Savings Bank ("Gold River Savings"). He also served on its board of directors. In 1988, Gold River Savings formed a wholly-owned service corporation, Gold River Investments. Gold River Investments was formed to invest in and to develop real estate. Gold River Investments had no employees. Officers of Gold River Savings held the same positions in Gold River Investments. Gold River Investments relied on Stoddard to act on its behalf in finding and in negotiating real estate deals. Stoddard arranged for transfers of funds related to any real estate deals through Jack Daybell, the Chief Financial Officer of Gold River Savings.

In August 1988, the Gold River companies entered into a Supervisory Agreement with the Office of Thrift Supervision ("OTS"). By virtue of the agreement, Gold River Savings could not commit to further credit extensions without the prior approval of the Supervisory Agent. In a December 13, 1989 letter, OTS declared Gold River Savings a "troubled institution." It was ordered not to increase its liabilities. Stoddard calls this the "lockdown" letter.

The transactions underlying the offenses of conviction involved properties known as Laguna Parklands and Foxboro Gardens. In October 1988, Stoddard contracted to purchase Laguna Parklands. The contract called for an initial escrow deposit of $25,000. Stoddard sent the purchase letter contract to Jack Daybell and others on November 4, 1988. The same day, Stoddard wrote to Jack Daybell telling him to deposit $25,000 with Connie Harling at First American Title, the money to be deposited in escrow account # 901943. Four days later, Daybell sent a $25,000 check on behalf of Gold River Investments payable to First American Title.

The Laguna Parklands deal was subject to the removal of certain contingencies. These were never removed so the deal fell through. On April 28, 1989, Live Oak Associates, the seller, authorized release of the $25,000 in escrow account # 901943 to Connie Harling at First American Title. Stoddard was sent a copy of this letter.

---

* The Honorable Donald W. Molloy, United States District Judge for the District of Montana, sitting by designation.

1. Stoddard was convicted of: (1) 18 U.S.C. § 1005, Concealing and covering up a material fact by trick, scheme or device of a matter within the jurisdiction of the Office of Thrift Supervision, and (2) 18 U.S.C. § 1001, Making a false entry in the books and records of a federally insured financial institution with intent to deceive a bank officer.

In September 1988, Stoddard was also negotiating to buy Laguna Estates, an eight acre tract adjacent to Laguna Parklands. Stoddard struck a deal with John Murier, of John Murier Construction, Inc., for Laguna Estates on St. Patrick's Day in 1989. The terms included an initial escrow deposit of $20,000 until removal of the buyer's contingencies. The contract named the buyer as "Richard Stoddard, et/or assigns."

Escrow number 902149 was opened for the sale of Laguna Estates on March 21, 1989. On May 1, 1989, Stoddard wrote to Connie Harling at First American Title asking that she transfer $20,000 from the first escrow account number 901943 (set up for the never-consummated Laguna Parklands sale) to the second escrow account number 902149 (set up for the Laguna Estates sale).

The Laguna Estates contract provided that upon removal of the buyer's contingency the $20,000 would pass through escrow to the seller. Stoddard authorized Connie Harling to disburse the $20,000 to John Mourier Construction in early August 1989. The sale was concluded on or near October 17th of the same year. Stoddard–Buhler Land Company was the purchaser. The same property was sold over a year later in November 1990 at a profit of $19,780.

Going back to September of 1988, Stoddard was also trying to buy a parcel of land known as Foxboro Gardens. His offer letter of October 20, 1988, called for a cash deposit of $5,000, again payable after the buyer's contingency was removed. On November 8, 1988, Stoddard wrote to Jack Daybell instructing him that a $5,000 deposit should be sent to Connie Harling at First American Title for escrow account number 901945. Eight days later, Daybell wrote to Harling and enclosed a deposit "in the amount of $5,000 for Escrow 901945—10.2 acres—Foxboro Gardens, Galt, California." The title company deposited the $5,000 in an interest bearing account with Imperial Bank.

The Foxboro sale was canceled on June 5, 1989. The buyer's contingency had not been satisfied. The sale was resurrected by an amended purchase letter agreement on June 23rd. The deal was closed on October 2, 1989. This property was purchased in the name of Stoddard–Buhler Land Company. In October 1990, the property was resold at a profit of $107,416.

On February 6, 1990, Jack Daybell sent a fax copy to Stoddard of an interest statement on the escrow accounts for calendar year 1989. Daybell thought there was a mistake in the interest computation. On February 9, 1990, Daybell wrote to Harling at First American Title requesting immediate return of funds in the amount of $30,000 deposited with the title company in November 1988 by way of check number 1035 ($25,000) and check number 1040 ($5,000). Later, Daybell followed-up and asked Harling to provide all documentation, disbursements or any other information in her possession regarding escrows opened with check numbers 1035 and 1040.

Harling notified Stoddard on February 20, 1990, that Daybell wanted return of the escrowed $30,000 together with an accounting. Stoddard wrote to Connie Harling acknowledging that Gold River Investments had made the $30,000 escrow payments. He observed that Gold River Investments "is not able to be a property purchaser at this time...." Stoddard wanted the deposits returned to Gold River Investments with interest, a total refund of $32,180.91. The day these transactions happened, February 20, 1990, Stoddard sent Harling a check in the amount of $22,500 for deposit to another escrow account, number 902314. A second check in the amount of $8,500 was to follow shortly. One day later, Stoddard sent the $8,500 to Harling.

Daybell submitted a Criminal Referral Form to the Federal Home Loan Bank Board on a suspected violation of misappropriation of escrow funds. He did so on February 28, 1990 following the transactions set forth above.

## III. Discussion

### A. Did the District Court err by denying Stoddard's Rule 29 Motion for Judgment of Acquittal?

#### 1. Standard of Review

■ Stoddard first claims the district court erred in denying his Rule 29 Motion for

Judgment of Acquittal. A motion for Judgment of Acquittal is reviewed on a sufficiency-of-the-evidence standard. *See United States v. Tisor*, 96 F.3d 370, 379 (9th Cir. 1996). Under that standard, evidence supports a conviction, if, viewed in the light most favorable to the government, it would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *United States v. Ross*, 112 F.3d 422, 425 (9th Cir.1997).

### 2. Concealing Material Fact

■ The indictment charged Stoddard with knowingly and willfully devising a scheme to conceal a material fact from the Office of Thrift Supervision by trick, scheme, and device.[2]

Stoddard benefitted personally from the escrow funds deposited with First American Title by Gold River Investments according to the Government's theory. A material fact was the contention that Stoddard purchased properties with the use of Gold River Investments funds, yet Gold River Investments received no benefit from those purchases.

According to the government, Stoddard tried to conceal that material fact by replenishing the escrow accounts shortly after Daybell demanded that the First American Title return the $30,000 together with an accounting. Also part of the cover up was Stoddard's assertion that Gold River Investments should return the escrow funds because Gold River Investments "is not able to be a property purchaser at this time."

Stoddard says the evidence is insufficient to support the conviction on Count Three. He concedes that the way the $30,000 in escrow funds were used is a material fact. However, according to him, there was no concealment. He points out that the letter contracts for the two land transactions state that the fund would be released from escrow only when the buyer's contingencies were removed. Thus, he suggests there was complete disclosure of material fact, not concealment. Stoddard further argues that his statement to First American Title Company was true: Gold River Investments could not be a property purchaser because it was under the "lock-down agreement" imposed by the Office of Thrift Supervision.

Based on the trial evidence a rational jury could find the essential elements of the crime beyond a reasonable doubt. Stoddard bought the properties in the name of the Stoddard–Buhler Land Company using escrow deposits funded by Gold River Investments. He had access to the escrow money because Jack Daybell always assumed Stoddard was acting for Gold River Investments when Stoddard asked that escrow funds be deposited with First American Title Company. Nothing in the record indicates Stoddard ever told Daybell that the Laguna Parklands sale had fallen through and that the escrow funds were switched to a different escrow account set up for the purchase of Laguna Estates.

Stoddard testified about conversations he had with Gold River Savings President Walter Dobbs. He testified that the conversations were to the effect that everyone at Gold River Savings knew about the escrow transfers. While this is his view of the evidence, a trier of fact could find that testimony not credible and instead infer that Stoddard was playing fast and loose with Gold River Investments's money. The timing of the replenishment of Gold River Investments's escrow account with Stoddard's checks of $22,500 and $8,500 permit the inference that Stoddard was reacting to Daybell's contact about an error in the escrow accounts. The letters to First American Title show that Daybell wanted to know what had happened to the monies deposited in escrow for the benefit of Gold River Investments. A rational trier could infer a cover-up on these facts.

It is reasonable to infer an attempt to conceal from Stoddard's statement to Connie Harling that the escrow funds should be returned to Gold River Investments because Gold River Investments was not able to be a property purchaser. Furthermore, when Stoddard returned the monies to the escrow account, the properties had already been sold to Stoddard–Buhler Land Company. A jury

---

**2.** Indictment, Count III.

could rationally infer that Stoddard's statement was at best a half-truth, designed to conceal what he had done with escrow funds to close deals that did not benefit Gold River Investments.

### 3. Making A False Entry

■ Count Four of the indictment charged Stoddard with making a false entry in the books and records of a federally insured financial institution with intent to deceive a bank officer. Again, Stoddard argues the proof cannot support his conviction. The government argues that the proof satisfied the essential elements of the crime because it showed Stoddard put a copy of his letter of February 20, 1990, to First American Title in Gold River Savings records.

The government argues the jury could find the letter false on its face. The letter tells First American to return the deposits Gold River Investments made to escrow. The problem is the "deposits" were not in escrow. Stoddard had transferred them out of the escrows months before. Even when he wrote the letter, the escrow accounts had not been fully replenished. The government says this is enough for the trier to infer that Stoddard wrote the letter to create the false impression that the money had never left the escrow company, and was still there to be "returned."

Stoddard concedes that the allegedly false entry in question is the carbon copy of the February 20, 1990, letter he wrote to the escrow officer at First American Title. Nonetheless, he claims that nothing in the letter is false. Stoddard's view is based on a literal reading of the letter. He says the critical second sentence is true: Gold River Investments was not able to be a property purchaser for two reasons (1) it ceased business in March 1990 and (2) the "lock-down" condition in the supervisory agreement prevented it from purchasing property.

Nothing compelled the trial court or the jury to accept Stoddard's view as a matter of law. A rational trier of fact could reject Stoddard's literal interpretation. The "lock-down" provision did not bar all real estate investment activities. Any deals required prior approval of OTS, which Stoddard never

sought. A trier of fact could rationally view the letter as a false statement. Stoddard's view is one of retrospect. Viewed by a jury in context temporally with all other facts provides a reasonable view that his literal interpretation is one of convenience.

We find the evidence supports the conviction on Counts Three and Four of the indictment. Accordingly, we affirm the district court's denial of Stoddard's Rule 29 motion.

### B. Did the District Court err in finding a loss of $30,000 for purposes of sentencing?

#### 1. Standard of Review

■ Stoddard argues that the district court was mistaken in fixing the amount of loss in the case at $30,000. The loss figure increases the base offense level by 4 levels. The district court's interpretation of the Sentencing Guidelines is reviewed de novo. *United States v. Newland,* 116 F.3d 400, 402 (9th Cir.1997). The meaning of "loss" under the guidelines is a question of law reviewed de novo. *United States v. Lucas,* 99 F.3d 1290, 1293 (6th Cir.1996).

#### 2. Amount of Loss

##### (a) § 2F1.1

■ The district court fixed the amount of loss at $30,000 and increased the base offense level from 6 to 10 based on that loss. USSG § 2F1.1. Stoddard argues the loss was zero so there should have been no 4–level increase in the base offense. Stoddard's argument is based on his view that there was zero loss because he fully refunded the escrow accounts.

USSG § 2F1.1, Application Note 7 states, "Valuation of loss is discussed in the Commentary to § 2B1.1 (Larceny, Embezzlement, and Other Forms of Theft).... Frequently, loss in a fraud case and will be the same as in a theft case." In some cases, though, "additional factors are to be considered in determining loss or intended loss." Application Note 7(a) & (b). However, the circumstances described in Note 7(a) & (b) are not exclusive and § 2B1.1 is not to be applied mechanically in valuing loss. *United*

*States v. Allison*, 86 F.3d 940, 943 (9th Cir. 1996). In *Allison*, we explained how loss should be calculated in a fraud case.

### (b) *U.S. v. Allison*

Allison and a co-defendant concocted a scheme to obtain credit cards. Peralta, the co-defendant, was a loan processor at a bank. Because of her position, she could create credit card accounts when there were no supporting applications. In that way, she issued credit cards to herself and Allison. Both then used the cards to get cash, goods, and services. Between them, Allison and Peralta ran up over $40,000 in charges. But, they paid over $5,000 to the bank on the credit card accounts. *Id.* at 941–42.

At sentencing, the issue arose as to the amount of loss: was it over $40,000 or was it under $40,000? The sentencing judge reasoned that the loss should reflect that the credit cards were effectively stolen from the bank. Thus, the loss was not actual loss but the "total amount of unauthorized charges," i.e., over $40,000. *Id.* at 942. Allison appealed.

We framed the issue for review as "whether, in a credit card fraud case, the amount paid by the defendant to the victim before indictment should be deducted from the amount of "loss" in calculating the sentence." *Id.* We began our analysis by reviewing the guidelines for loss calculation.

The undisputed applicable guideline was § 2F1.1. *Id.* Section 2F1.1 cross-references § 2B1.1 for purposes of loss valuation. We held that in certain exceptions § 2F1.1 does not use the definition of loss in § 2B1.1. *Allison*, 86 F.3d at 943 (quoting § 2F1.1 n. 7(b)). These "express exceptions," however, are not exclusive. *Id.* Instead of "mechanically apply[ing] U.S.S.G. § 2B1.1 ... in calculating loss in fraud cases," we advised sentencing courts to "take a realistic, economic approach to determine what losses the defendant truly caused or intended to cause, rather than the use of some approach which does

not reflect the monetary loss." *Id.* (emphasis added).

After applying the "economic reality approach" to the facts in *Allison*, we found that the actual loss was "the outstanding credit card balance prior to the discovery of the offense, not the total amount charged on the four credit cards." The outstanding credit card balance "more realistically" reflected the amount of loss. *Id.* at 944.

### (c) Stoddard's view of Allison

Stoddard argues *Allison* applies in his favor. He says, if there was a crime, it was discovered when Daybell prepared the Criminal Referral Form for submission to the Federal Home Loan Bank Board on February 28, 1990. By then, Stoddard had repaid the escrow funds with interest. Accordingly, Stoddard argues there was no loss. We reject Stoddard's reading of *Allison*. The crime was discovered on February 20, 1990, when Daybell wrote to Stoddard about the discrepancy in the escrow accounts at First American.

In applying the "economic reality" approach to the determination of actual loss we clarify *Allison* in one important respect: *Allison* only applies to amounts repaid by defendant to the victim prior to discovery of the offense. Repayments do not apply to actual loss if they are made after discovery of the offense but prior to indictment.[3]

Fixing actual loss at discovery of the offense comports with the rationale of the economic reality approach. The "economic reality approach" is designed to "determine what losses the defendant caused or *intended to cause.*" *Allison*, 86 F.3d at 943–44 (emphasis added). Repayments before detection show an untainted intent to reduce any loss. Repayments after detection may show no more than an effort to reduce accountability.

In this case, when the offense was discovered actual loss was $30,000. We affirm the district court's determination of loss and the

---

**3.** The court in *Allison* appears to use the terms interchangeably. *Compare Allison*, 86 F.3d at 942 (framing issue in terms of whether the amount paid by defendant *prior to indictment* should be deducted from loss) *with* 86 F.3d at 944 (actual loss is outstanding credit card balance prior to the *discovery of the offense*) (emphasis added).

concomitant enhancement to the total offense level.

## C. Did the District Court err in ordering restitution in the amount of $116,223?

### 1. Standard of Review

█ A restitution order is reviewed for an abuse of discretion, provided that it is within the bounds of the statutory framework. *United States v. Nash,* 115 F.3d 1431, 1441–42 (9th Cir.1997). Factual findings supporting an order of restitution are reviewed for clear error. *United States v. Petersen,* 98 F.3d 502, 510 n. 7 (9th Cir.1996). The legality of an order of restitution is reviewed de novo. *United States v. Rutgard,* 116 F.3d 1270, 1294 (9th Cir.1997).

### 2. Restitution As It Relates to Loss

█ Stoddard argues that the district court erred in imposing $116,223 in restitution because it found only $30,000 in actual loss. The government contends that restitution and loss for sentencing purposes serve two different purposes. In the government's view, the figure for restitution need not be the same as the figure for loss.

█ Restitution in a criminal case is authorized by the Victim and Witness Protection Act, codified at 18 U.S.C. §§ 3663–64. "[R]estitution can only include losses directly resulting from a defendant's offense." *United States v. Sablan,* 92 F.3d 865, 870 (9th Cir.1996). For that reason, "a restitution order must be based on losses directly resulting from the defendant's criminal conduct." *Id.* at 870. Consequential expenses may not be legally included in an order of restitution. *Id.* Restitution can only be based on actual loss. *United States v. Catherine,* 55 F.3d 1462, 1464 (9th Cir.1995) ("Loss under 18 U.S.C. § 3663 is the *actual loss.*").

Applying the economic reality approach to loss calculation, we determined above that actual loss in this case is $30,000. Accordingly, we remand to the district court for resentencing on the issue of restitution based on actual loss of $30,000.

### 3. Ability to Pay

Stoddard next argues that the district court mistakenly ordered him to pay an amount in restitution that exceeded his ability to pay. The government maintains that the district court made the requisite findings that Stoddard would have the future ability to pay the restitution ordered.

█ Stoddard relies on *United States v. Ramilo,* 986 F.2d 333 (9th Cir.1993). In *Ramilo,* we held that "at the time restitution is ordered the record must reflect some evidence the defendant may be able to pay restitution in the amount ordered in the future." *Id.* at 336 (emphasis supplied). However, the court acknowledged that restitution may be imposed on an indigent defendant. *Id.* If a district court imposes restitution on an presently indigent defendant, it must consider defendant's future ability to pay. *Id.;* see also *United States v. English,* 92 F.3d 909, 916–17 (9th Cir.1996) (restitution order must be based on "some evidence" of defendant's future ability to pay).

█ Here, the district court considered Stoddard's future ability to pay. The court noted that the "history of [Stoddard's] professional and business life" demonstrated a successful individual who would "become successful again." That finding does not amount to abuse of discretion. *Compare Sablan,* 92 F.3d at 871 (no abuse of discretion in imposing restitution on indigent defendant who "has an education ... and skills that can still be used on the job market").

We affirm the district court in all respects except on the issue of restitution. The case is remanded to the district court for resentencing based upon the sentencing judge's accurate finding that actual loss in this case was $30,000.

Affirmed and remanded.

FERGUSON, Circuit Judge, concurring and dissenting.

I concur in the majority opinion except for Part C. I dissent because the district court properly ordered restitution in the amount of $116,223.00. The defendant took a business opportunity away from the bank, made a

profit, and therefore should make restitution of the profit.

Although the majority details at length the fraud, escrow, property purchases, and profit dealings of the defendant, they fail to understand that the defendant misappropriated not only $30,000 from the bank but wilfully and deliberately took away a business opportunity. The district court understood exactly what the defendant did and therefore made the restitution order which the majority now rejects.

The district court correctly considered the profit the defendant made from his misappropriation of funds as part of the actual loss suffered by the Gold River Bank. The defendant violated 12 C.F.R. § 571.9 (1989) which requires officers and directors of banks to obtain regulatory approval before taking a business opportunity away from a bank. This regulation addresses the serious consequence self-dealing has had on the health of financial institutions in this country. "Problem banks and insider abuses have been virtually synonymous. Nothing appears more often in the fever charts of sick financial institutions than self-dealing ailments." *See generally* H.R.Rep. No. 1383, 95th Cong., 2d Sess. 10, *reprinted in* 1978 U.S.Code Cong. & Admin. News 9273, 9282.

The district court found that the initial cash amount misapplied by the defendant in his fraudulent scheme was $30,000, and used that figure in determining the offense level for the purpose of his sentencing pursuant to U.S.S.G. § 2F1.1(b)(1)(E).

However, the Victim and Witness Protection Act ("VWPA") 18 U.S.C. §§ 3663–3664, governs restitution in criminal cases, not the sentencing guidelines. As we stated in *United States v. Catherine,* 55 F.3d 1462, 1465 (9th Cir.1995), "The different method of calculating loss in each case is due to the different purposes behind the statues." *See also United States v. Gilberg,* 75 F.3d 15, 23 n. 7 (1st Cir.1996) (Loss calculations under U.S.S.G. § 2F1.1 are based on criteria different from the VWPA criteria). Therefore, we are bound to determine restitution according to VWPA criteria.

The VWPA states that a district court may award an amount equal to the greater of: (1) the value of the property on the date of the damage, loss, or destruction; or (2) the value of the property on the date of sentencing. Here, the defendant took a business opportunity away from the bank and with that misappropriation made a profit of $116,223. Congress has stated with certainty that defendants may be required by an order of restitution to disgorge the profit that they made from the theft of victims' property. The business opportunity had reached a value far in excess of $30,000. As we held in *United States v. Sablan,* 92 F.3d 865, 870 (9th Cir.1996), "a restitution order must be based on losses directly resulting from the defendants criminal conduct." Here the loss directly resulting from the misappropriation of the business opportunity was the profit made by the defendant.

I therefore dissent. The district court was correct in its determination that the defendant should not be permitted to profit from his crime.