**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jess A. RODRIGUES, Defendant–
Appellant.**

No. 99–10404.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 10, 2000

Filed Oct. 26, 2000

shippers be uniform." 350 U.S. at 338, 76 S.Ct. 373.

Nina Wilder, Weinberg & Wilder, San Francisco, California, for the defendant-appellant.

J. Douglas Wilson, Chief, Appellate Section, Assistant United States Attorney, San Francisco, California, for the plaintiff-appellee.

Before: THOMPSON, T.G. NELSON and SILVERMAN, Circuit Judges.

SILVERMAN, Circuit Judge:

Defendant Jess A. Rodrigues, former owner and Chairman of the Board of Saratoga Savings and Loan in California, stands convicted of ten criminal counts arising from his participation in four real estate transactions with Saratoga between 1984 and 1988. At sentencing, the district court applied the Victim and Witness Protection Act (VWPA), 18 U.S.C. §§ 3663, 3664, and ordered Rodrigues to pay restitution of $1.5 million, measured by Rodrigues' profits in the four real estate ventures, to compensate Saratoga for corporate opportunities usurped by Rodrigues. Rodrigues appeals the restitution order arguing that under the VWPA, the district court was not authorized to award restitution for Saratoga's lost corporate opportunities. We have jurisdiction over this appeal under 28 U.S.C. § 1291, and we reverse and remand for further proceedings.

## I. Background

Like many savings and loan institutions founded in the 1980's, Saratoga has a checkered history. In 1982, California Housing Securities, Inc. (Cal Housing), a mortgage banking company owned solely by Rodrigues, purchased Saratoga's charter, with Saratoga becoming Cal Housing's wholly owned subsidiary. In 1983, Saratoga became a member of the Federal Home Loan Bank and opened for operations. From 1983 to 1989, Rodrigues served as Chairman of the Board of Directors for Saratoga. In response to improper mortgage loan activities, the Resolution Trust Corporation (RTC) seized Saratoga and placed it under a conservatorship in November, 1989. On December 5, 1989, the Office of Thrift Supervision issued an order banning Rodrigues from participating in Saratoga's or Cal Housing's activities. On May 24, 1990, the RTC was made receiver of Saratoga. The RTC liquidated Saratoga's property and transferred its remaining assets to a new, federally chartered savings and loan.

In 1994, Rodrigues was indicted on 47 counts arising out of his stewardship of Saratoga. Nineteen counts were eventually tried to a jury, and Rodrigues was convicted on all charges and sentenced to 3 years imprisonment and $3.6 million in restitution. On appeal, this court reversed nine counts; however, we upheld ten counts including four counts of self dealing by an officer of a federally insured bank, in violation of 18 U.S.C. § 1006, four counts of making a false entry in the records of a federally insured savings and loan, also in violation of 18 U.S.C. § 1006, and two counts of making false statements for the purpose of influencing the Federal Savings and Loan Insurance Corporation, in violation of 18 U.S.C. § 1008 (now repealed),

and remanded for resentencing. *See United States v. Rodrigues*, 159 F.3d 439 (9th Cir.1998) (*Rodrigues I* ). On remand, the district court sentenced Rodrigues to time served, 24 months of supervised release, a $7,500 fine, and restitution of $1.5 million.

The counts which were upheld in *Rodrigues I* and formed the basis for the restitution order arose out of the following four real estate transactions.

### The Lick Avenue Deal

On January 18, 1984, Rodrigues signed a letter committing Saratoga to participate in a joint venture with Ron Tate and David Lazares to purchase property on Lick Avenue in San Jose, California. A few days later, Rodrigues substituted himself for Saratoga as a one-third participant. Despite Saratoga's withdrawal as an equity partner, it issued a $3 million loan commitment letter to Tate, Lazares, and Rodrigues to finance the Lick property. However, on May 29, 1984, the partners secured alternate financing, funding the project with a $3.8 million loan from Home Federal. In May 1988, the property was sold, and Rodrigues received one-third of the profit.

### The Marina Deal

In March 1984, again co-venturing with Tate and Lazarus, Rodrigues agreed to provide $500,000 to purchase undeveloped land in Marina, California. In November 1984, Saratoga funded the venture with a loan of $456,000. The loan was eventually paid off with interest. The project was sold in December 1986 and Rodrigues received one-third of the profits.

### The Continental Can Deal

In June 1985, the same partners needed $1.6 million in financing to buy warehouse property at the former Continental Can Company site in San Jose, California. Rodrigues arranged for the partners to draw $800,000 each against personal lines of credit at Saratoga. In exchange, Saratoga would receive a fee of $200,000 for making the funds available. After escrow closed, however, Rodrigues told the partners that in lieu of the fee to Saratoga, Rodrigues would personally take a one-third interest in the property. The partners sold the property in April 1986, and Rodrigues received one-third of the profits.

### The Cinnabar Deal

In February 1984, Rodrigues formed a joint venture with two different partners, Richard Christina and Murray Hall, to purchase the Cinnabar Building, a warehouse in San Jose. The partners financed the project with personal contributions of $150,000 each, a $1 million loan from Crocker Bank, and a $400,000 personal line of credit to Christina and Murray from Saratoga. The property was sold in 1987, with Rodrigues again receiving one-third of the profits.

## II. Analysis

### Standard of review

■ "A restitution order is reviewed for an abuse of discretion, provided that it is within the bounds of the statutory framework. Factual findings supporting an order of restitution are reviewed for clear error. The legality of an order of restitution is reviewed de novo." *United States v. Stoddard*, 150 F.3d 1140, 1147 (9th Cir. 1998) (citations omitted).

### Applicable law

■ All of the events at issue in this case occurred before 1989. Although substantial amendments to the VWPA were enacted in 1990, we apply the statute as it existed at the time of the offense conduct. *United States v. DeSalvo*, 41 F.3d 505, 515 (9th Cir.1994) (applying the post amendment VWPA to criminal conduct that did not continue past the effective date of the amendments would violate the ex post facto clause of the Constitution); *see also United States v. Baggett*, 125 F.3d 1319, 1322 (9th Cir.1997) (stating that if on remand the district court found the VWPA applied, the court must use old version of

statute to avoid violating ex post facto clause).

In pertinent part, the VWPA, codified at 18 U.S.C. §§ 3663–3664, stated:

**Order of restitution**

(a) The court ... may order, in addition to or, in the case of a misdemeanor, in lieu of any other penalty authorized by law, that the victim make restitution to any victim of such offense.

(b) The order may require that such defendant—

(1) in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense—

(A) return the property to the owner of the property or someone designated by the owner; or

(B) if return of the property under subparagraph (A) is impossible, impractical, or inadequate, pay an amount equal to the greater of—

(i) the value of the property on the date of the damage, loss, or destruction, or

(ii) the value of the property on the date of sentencing, less the value (as of the date the property is returned) of any part of the property that is returned;

(2) in the case of an offense resulting in bodily injury to a victim—

. . .

(C) reimburse the victim for income lost by such victim as a result of such offense; ...

18 U.S.C. § 3663 (1988).

**Lost Corporate Opportunities Under the VWPA**

■ The district court found that Rodrigues usurped Saratoga's corporate oppor-

tunities by substituting himself for Saratoga in the four real estate transactions. Applying the VWPA, the court ordered Rodrigues to pay Saratoga $1.5 million in restitution, measured by Rodrigues' profit in the four ventures. Although there is no dispute that the loans extended by Saratoga at Rodrigues' direction were repaid with appropriate interest, the government argues that Saratoga was damaged by having lost the *opportunity* to participate in the deals as an equity partner, entitling Saratoga to restitution under the VWPA. We disagree.

■ In enacting the VWPA, Congress intended to "authorize an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 413, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990); *United States v. Sharp*, 941 F.2d 811, 815 (9th Cir.1991).[1] Accordingly, the VWPA only authorizes restitution up to the amount actually lost by the victims. *United States v. Barany*, 884 F.2d 1255, 1260 (9th Cir.1989); *United States v. Messner*, 107 F.3d 1448, 1455 (10th Cir. 1997). Restitution is not available for consequential losses, *United States v. Sablan*, 92 F.3d 865, 870 (9th Cir.1996), or other losses too remote from the offense of conviction. *See, e.g., Barany*, 884 F.2d at 1261 (victim's attorney's fees too remote); *Kenney*, 789 F.2d at 784 (wages for trial witnesses too remote); *Tyler*, 767 F.2d at 1351 (decline in value of timber while awaiting trial too remote).[2]

In *United States v. Stoddard*, 150 F.3d 1140, 1147 (9th Cir.1998), this court implicitly considered whether restitution of profits from lost corporate opportunities was

**1.** Certain aspects of *Hughey, Sharp,* and other cases cited in this opinion were superseded when Congress passed the 1990 amendments to the VWPA.

**2.** Every other circuit to consider whether the VWPA authorizes restitution for contingent losses has come to the same conclusion. *See, e.g., United States v. Schinnell*, 80 F.3d 1064,

1070–71 (5th Cir.1996); *Government of the Virgin Islands v. Davis*, 43 F.3d 41, 45 (3rd Cir.1994); *United States v. Diamond*, 969 F.2d 961, 968 (10th Cir.1992); *United States v. Mullins*, 971 F.2d 1138, 1147 (4th Cir.1992); *United States v. Arvanitis*, 902 F.2d 489, 498 (7th Cir.1990).

authorized by the VWPA. In *Stoddard,* the defendant, an official of a savings bank, misappropriated $30,000 from an escrow account and used the money to fund two real estate purchases. 150 F.3d at 1142–43. The defendant later sold the properties at a profit. *Id.* The district court ordered restitution in the amount of $116,223, apparently encompassing the defendant's profits from the real estate transactions. *Id.* at 1147–48 (dissent). This court, noting that the VWPA only allows restitution for direct losses, found that the bank's direct or "actual loss" was $30,000 and remanded for resentencing. *Id.* at 1147. The dissent argued that the bank's direct loss was $116,223, representing the lost profits from the lost business opportunities the defendant took from the bank. *Id.* at 1147–48 (dissent). The majority, however, did not comment on this theory. Thus, *Stoddard* did not explicitly determine whether the VWPA allows restitution for lost corporate opportunities. Today, we address the question that *Stoddard* left unanswered.

 Based on the duty of loyalty, the corporate opportunity doctrine provides that a corporate fiduciary, such as a director, officer, or controlling shareholder, may not usurp the corporation's business opportunities without proper consent. *See Citicorp Venture Capital, Ltd. v. Committee of Creditors,* 160 F.3d 982, 987 (3rd Cir.1998). If the corporate fiduciary breaches this rule, the corporation may seek an equitable forfeiture, requiring the fiduciary to return any ill-gotten gain. *See United Teachers Assoc. Ins. Co. v. MacKeen & Bailey, Inc.,* 99 F.3d 645, 650 (5th Cir.1996). While the doctrine appears straightforward in principle, courts struggle with its application because defining what constitutes a corporate opportunity is often an elusive task. Most courts limit the doctrine to business opportunities in which the corporation has at least a "tangible expectancy, which means something much less tenable than ownership, but, on the other hand, more certain than desire

or hope." *American Federal Group, Ltd. v. Rothenberg,* 136 F.3d 897, 906 (2nd Cir. 1998); *see also Robinson, Leatham & Nelson, Inc. v. Nelson,* 109 F.3d 1388, 1392 (9th Cir.1997) (applying California corporate opportunity doctrine to breach of fiduciary claims). Although the corporate opportunity doctrine allows recovery for a variety of interests, including mere expectancies, restitution under the VWPA is confined to direct losses. *See Stoddard,* 150 F.3d at 1147.

In the instant case, Saratoga suffered a loss when Rodrigues appropriated the Marina and Cinnabar opportunities without Saratoga's consent; however, Saratoga did not suffer a *direct* loss. Instead, Saratoga suffered a contingent loss because although it had a tenable, expectancy interest in the ventures, Saratoga had not committed to investing in the projects. Thus, we hold that Saratoga's expectancy interest in these ventures had not matured into the type of vested, direct property interest for which the VWPA allows restitution.

If Saratoga's only loss in the four real estate ventures was its lost corporate opportunity, this would end our inquiry. From the record on appeal, however, it is not clear that Saratoga's corporate opportunities were the only interest involved in all of these transactions.

With respect to the Marina and the Cinnabar deals, no evidence on the record indicates that Saratoga had any involvement in the transactions beyond extending loans that were repaid with appropriate interest. As the district court's restitution order regarding these transactions rested solely upon a corporate opportunity theory, restitution for the Marina and Cinnabar transactions must be reversed.

In the Lick Avenue venture, as we noted in *Rodrigues I,* there is evidence that Rodrigues initially committed Saratoga as a one-third partner in the venture. 159 F.3d at 444. Rodrigues later substituted himself for Saratoga, and in doing so, may have converted Saratoga's direct interest in the contract to his own use. We com-

mented in *Rodrigues I* on this particular transaction, stating "Saratoga's commitment letter, *which was a thing of value,* resulted in no benefit to Saratoga; it did to Rodrigues. There was a fraud on Saratoga, and the intent to defraud is established by Rodrigues's willingness to use *Saratoga's assets* to benefit himself." *Id.* at 445 (emphasis added). To the extent that the district court's restitution order rested upon restoring Saratoga for lost corporate opportunities in the Lick Avenue venture, it was improper and is reversed. On the other hand, if Rodrigues usurped Saratoga's vested contractual interest in the property, restitution for that interest would be proper. We remand for determination of the exact nature of the agreement between Saratoga and the other investors. If the district court finds that Rodrigues converted Saratoga's vested rights in the Lick contract to his own use, the court should determine the value of that interest and award restitution accordingly.

In the Continental Can deal, the partners agreed that Saratoga would receive a $200,000 fee for extending credit. *Rodrigues I,* 159 F.3d at 444. When Rodrigues canceled the fee after closing and took a personal one-third interest in the deal in exchange for Saratoga's earned fee, he converted Saratoga's property for personal gain. In this instance, the direct loss to Saratoga is plain. On remand, the district court is directed to order restitution in the amount of $200,000 for the Continental Can deal.

### III. Conclusion

For the reasons discussed above, the judgment of the District Court for the Northern District of California is REVERSED and this action is REMANDED for further proceedings consistent with this opinion.