UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

———————————

Nos. 97-4466(L)
(CR-96-6-V)

———————————

United States of America,

                                Plaintiff - Appellee,

        versus

Michael Sevane Rhynes,

                                Defendant - Appellant.


———————————

O R D E R

———————————


        The court amends its opinion filed July 10, 2000, as follows:

        On the cover sheet, section 3, line 2 -- "Charles H. Haden II, Chief District Judge, sitting by designation" is added to the lower court information.

                                For the Court - By Direction



                                /s/ Patricia S. Connor
                                    Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                          No. 97-4466

MICHAEL SEVANE RHYNES,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                          No. 97-4640

MICHAEL SEVANE RHYNES,
<u>Defendant-Appellant.</u>

Appeals from the United States District Court
for the Western District of North Carolina, at Charlotte.
Charles H. Haden II, Chief District Judge, sitting by designation;
Richard L. Voorhees, District Judge.
(CR-96-6-V)

Argued: April 4, 2000

Decided: July 10, 2000

Before WILKINSON, Chief Judge, and WIDENER, WILKINS,
NIEMEYER, LUTTIG, WILLIAMS, MICHAEL, MOTZ,
TRAXLER, and KING, Circuit Judges.*

_____

Judgment vacated and new trial awarded by published opinion. Judge
_____

*Judge Murnaghan did not participate in the disposition of this appeal.

King announced the judgment of the Court, in which Judge Widener, Judge Wilkins, Judge Luttig, Judge Williams, Judge Michael, Judge Motz, and Judge Traxler joined; wrote the opinion of the Court with respect to Part III, in which Judge Wilkins, Judge Williams, Judge Michael, Judge Motz, and Judge Traxler joined; wrote the opinion of the Court with respect to Parts IV and V, in which Judge Widener, Judge Wilkins, Judge Luttig, Judge Williams, Judge Michael, Judge Motz, and Judge Traxler joined; and wrote an opinion with respect to Parts I and II in which Judge Widener (except perhaps for a footnote), Judge Luttig (in part), Judge Michael, and Judge Motz joined. Judge Widener wrote an opinion concurring in part and concurring in the judgment. Judge Wilkins wrote an opinion concurring in part and concurring in the judgment, in which Judge Williams and Judge Traxler joined. Judge Luttig wrote an opinion concurring in part and concurring in the judgment. Chief Judge Wilkinson wrote a dissenting opinion, in which Judge Niemeyer joined. Judge Niemeyer wrote a dissenting opinion, in which Chief Judge Wilkinson joined and in which Judge Traxler joined with respect to Parts I and II.

_____

**COUNSEL**

**ARGUED:** Michael Smith Scofield, Charlotte, North Carolina, for Appellant. Robert Jack Higdon, Jr., OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Gretchen C.F. Shappert, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

_____

**OPINION**

KING, Circuit Judge:

Michael Rhynes and several co-defendants were tried before a jury in the Western District of North Carolina on a number of drug-related charges. During the presentation of Rhynes's defense, the district court excluded his sole supporting witness after finding that his lawyer had violated the court's sequestration order. We conclude today that the exclusion of the witness's testimony was improper and consti-

2

tutes reversible error. The conduct of Rhynes's lawyer did not contravene the district court's sequestration order, and, if it had, the sanction of witness exclusion was unduly severe. Because this error was not harmless, we must vacate Rhynes's conviction and sentence and remand for a new trial.

I.

A.

At the outset, we briefly review the proceedings that have brought us to en banc review. The convictions of Michael Rhynes and his six co-defendants followed a three-week trial, and a panel of this Court subsequently heard and considered their consolidated appeals. On October 26, 1999, the panel disposed of the appeals by a published decision that, inter alia, affirmed Michael Rhynes's conviction and thirty-year sentence thereon. See United States v. Rhynes, 196 F.3d 207, 243 (4th Cir. 1999).

Thereafter, each of the defendants petitioned for rehearing, and the Government cross-petitioned, seeking rehearing of certain issues decided in the defendants' favor. On February 3, 2000, we denied, with a single exception, each of the rehearing petitions. In the exception, we deconsolidated Rhynes's appeals from those of his co-defendants and granted rehearing en banc on a single issue: whether the district court's exclusion of Corwin Alexander as a witness constitutes reversible error (the "witness exclusion issue"). By granting limited rehearing en banc, we vacated the panel decision insofar as it relates to the witness exclusion issue. See Local Rule 35(c). On April 4, 2000, that issue was argued before the en banc court.

B.

The panel opinion thoroughly recounts the extensive and complicated history underlying the convictions of Michael Rhynes and his co-defendants. Rhynes, 196 F.3d at 213-43. Thus, we focus here only on the facts relating to the witness exclusion issue.

3

1.

On September 24, 1996, at the commencement of the trial in Charlotte, North Carolina, a lawyer for one of Rhynes's co-defendants moved for sequestration of the Government's witnesses. In response, the district court entered its sequestration order from the bench.[1] The Government then noted that its "case agent" and a "summary witness" were in the courtroom and intended to "sit[ ] in on the testimony prepared to testify at the end of the trial[.]" J.A. 274. The district court granted the Government's request that two of its witnesses be excepted from the sequestration order and another motion that the defense witnesses be sequestered. Thereafter, the lawyer for one of Rhynes's co-defendants sought to have his investigator excepted from the sequestration order, and the court granted the exception "[s]o long as your investigator observes Rule 615 and does not talk to the witnesses about testimony that has just concluded or testimony that has concluded." J.A. 275.

2.

During the Government's case-in-chief, it presented the testimony of witness D. S. Davis. Davis is a convicted felon and was, at the time of trial, serving a seven-year sentence for participating in a drug conspiracy. Davis testified, <u>inter alia</u>, that he first met Alexander in 1990, when he (Davis) asked Alexander to serve as an intermediary in a drug transaction between Davis and Michael Rhynes.

_____

[1] The entirety of the court's sequestration order is in the record as follows:

> Well, I do grant the usual sequestration rule and that is that the witnesses shall not discuss one with the other their testimony and particularly that would apply to those witnesses who have completed testimony not to discuss testimony with prospective witnesses, and I direct the Marshal's Service, as much as can be done, to keep those witnesses separate from the-- those witnesses who have testified separate and apart from the witnesses who have not yet given testimony who might be in the custody of the marshal.

J.A. 273-74.

In response to an objection from Rhynes's lawyer, Michael Scofield, the Government explained at the bench that it was "getting to the focal point of Mike Rhynes." J.A. 1695. Specifically, the Government noted that Alexander was listed as a witness for Rhynes, and it believed that Davis would testify that Alexander had been approached to serve as an intermediary between Davis and Rhynes but that Alexander had never completed a transaction between the two. In response, Mr. Scofield stated:

> Well, I didn't know what -- where he was going with Corwin Alexander, so I had no information that they allege he was a member of the conspiracy. It sounded like you're not alleging that now.

J.A. 1695. The Government replied, apparently in reliance on Davis's statements, that Alexander had told Davis that Rhynes "did not have the drugs at that time," J.A. 1696, and Davis thereafter dealt directly with Rhynes.

Davis then concluded his testimony in support of the Government's case. He maintained that Alexander had approached Rhynes on two occasions with proposals of drug deals with Davis. According to Davis, Alexander passed those offers to Rhynes, who did not accept either offer. Subsequently, Davis approached Rhynes directly, and Rhynes agreed to sell him cocaine. Thereafter, according to Davis, Rhynes sold him drugs on several occasions.

3.

During Rhynes's defense, he testified on his own behalf; then, he called a single witness to corroborate his testimony: Corwin Alexander. Alexander testified on a number of subjects, see infra note 3, before he was asked about the Government's earlier witness, Davis. Alexander explained that, at a meeting between the two, Davis told Alexander that the Government had offered Davis a deal in exchange for information about Rhynes. Alexander then stated,"And he [(Davis)] went off to do his time, and I hear from Tuesday he got up and said --," whereupon the Government objected and requested a bench conference. J.A. 1945L.

5

At the bench, Mr. Scofield advised the district court that he had discussed Davis's testimony with Alexander: "I specifically told him about that testimony and told him I was going to ask him about that, Your Honor. And I don't think that violates the sequestration order." J.A. 1945M. The district court indicated its belief that the sequestration order had been violated. Mr. Scofield then responded, "I'm sorry then, Your Honor. I've done wrong then because I don't know how else I can prepare him to testify. I told him that that guy told him that he was a drug dealer." Id.

The district court nonetheless granted the Government's motion to strike Alexander's testimony and to exclude him as a witness.[2] The court did not develop the record further, either by obtaining any additional testimony from Alexander or by securing a proffer or testimony from Mr. Scofield.

4.

Following a brief recess, which apparently included an off-the-record in camera discussion, Mr. Scofield requested another bench conference to discuss the witness exclusion issue. There, he apologized to the court and attempted to deflect any sanction away from his client and onto himself, stating:

> Your Honor, as I told you in chambers, I now realize that the proper thing for me to do in interviewing Alexander and preparing him to testify was that I could have asked him all the details of whether he had been a dealer and whether he had done drug deals with Michael Rhynes and that sort of

_____

[2] At that point, the following colloquy took place between the court and Mr. Scofield:

> The Court: It's very unprofessional. It's an absolute breach of the Rule 615, and I don't see how you think you can get that just because you think you are preparing a witness.

> Mr. Scofield: Well, I have to ask him about it. I want to ask him about it on direct.

J.A. 1945M-45N.

6

thing without telling him that Davis had said that he had done that.

I wanted to specifically ask him about his relationship with D. S. Davis. And as I told the court, I did tell him that D. S. Davis had said that he had done these drug deals and that I wish I had been more alert in drawing that line about just asking the questions without saying what D. S. Davis had said in the court. I am concerned that my mistake will rebound to the harm of my client and my client will be prejudiced and I would -- I'd asked the court in chambers if you would revisit your decision to strike Corwin[ ] [Alexander's] testimony and not let him testify further. The court indicated that it would not, and I asked if I could make a proffer.

J.A. 1945P-45Q (emphasis added).

Scofield then made a proffer of the balance of Alexander's testimony.[3] According to Mr. Scofield, Alexander would have testified that he never dealt drugs with Davis or anyone else. Alexander also knew Davis well enough to form the opinion that Davis was untruthful, and that Davis was testifying under pressure to "save three years" of imprisonment. J.A. 1945R. Moreover, Alexander would have corroborated Rhynes's testimony about an automobile accident and an insurance settlement, which would provide further explanation for what the

_____

[3] Before his in-court testimony was curtailed, Alexander testified on a number of subjects. Among other things, Alexander stated that he was Rhynes's best friend and that Rhynes had lived close by for years. In addition, Alexander spoke about Rhynes's involvement in a number of his (Rhynes's) father's businesses and other jobs; this testimony indicated the source of Rhynes's otherwise "unexplained wealth." Alexander also testified about his knowledge of D. S. Davis. He stated that Davis asked him about obtaining some drugs, in response to which he told Davis that he was not involved with drugs at all. According to Alexander, Davis informed him that he was a drug dealer. Alexander also recounted a conversation with Davis following Davis's arrest on drug charges in which Davis told him that, even though he did not have any incriminating evidence against Rhynes, the authorities wanted him to implicate Rhynes, or he would face more time in prison.

7

Government had presented as Rhynes's "unexplained wealth." Alexander also would have challenged the testimony of another witness, Ted Howze, about Howze's dealings with Rhynes, and Alexander would have offered both his opinion and reputation evidence that other witnesses, including Andy Stinson, Kenny Funderburk, Lester Norman, Jerry Harrison, and Tyron Hicks were untruthful. Further, Alexander would have testified that he accompanied Rhynes on a trip to New York, which the Government claimed had been a drug-related trip. Alexander would have explained that he and Rhynes had gone to see a basketball game and that they had had no involvement with drugs, on this trip or otherwise. Finally, Alexander would have corroborated other details about Rhynes.

At the conclusion of the bench conference, the district court denied Mr. Scofield's request to revisit the witness exclusion issue,[4] and Alexander's testimony was excluded from the trial.

II.

A.

We review a district court's evidentiary rulings, including an order

_____

[4] The district court further explained its exclusion of Alexander as a witness in the following manner:

> I would have to say that your proffer about all the information that Mr. Alexander has about witnesses who have testified in this trial would certainly lead this judge to conclude that my Rule 615 order was violated as to the testimony of many witnesses.
> . . .
>
> And not only D. S. Davis. And, you know, I have to state that strongly on the record, and I consider this to be a reasonable and a light sanction under the circumstances.

J.A. 1945T-45U.

Mr. Scofield responded: "Your Honor, I do not believe, as I stand here and think about it, that I mentioned anybody else's testimony other than D. S. Davis. . . . I asked him, you know, details or relationships with other people who had testified, but did not relate any other testimony." J.A. 1945U-45V.

8

excluding witnesses or striking their testimony, for an abuse of discretion. General Elec. Co. v. Joiner, 522 U.S. 136, 141-42 (1997). Alternatively, we review de novo a district court's resolution of questions of law. United States v. Legree, 205 F.3d 724, 728 (4th Cir. 2000).

B.

It is significant to our consideration of this appeal that the district court invoked "the usual sequestration rule . . . that the witnesses shall not discuss one with the other their testimony." This order thus had two parts: (1) the "usual sequestration rule" and (2) that witnesses were not to discuss their testimony with one another ("extending language").

For several reasons, it is apparent that the reference to "the usual sequestration rule" did nothing more than invoke Federal Rule of Evidence 615, the rule relating to sequestration orders. At the outset, the reference to a "rule" in the order was an obvious invocation of Rule 615.[5] The district court's subsequent statements relating to the sequestration order similarly made clear to each of the parties that "the usual sequestration rule" was coextensive and conterminous with Rule 615. First, immediately after entering its order, the court permitted a co-defendant's investigator to remain in the courtroom, but only if the investigator "observes Rule 615." J.A. 275. Later, when it initially interrupted Alexander's testimony, the court stated, "It's an absolute breach of the Rule 615" (J.A. 1945M); similarly, when the court decided not to revisit its witness exclusion determination, it noted: "[M]y Rule 615 order was violated as to the testimony of many witnesses." J.A. 1945U. Given these three clear references to Rule 615, we can only conclude that the district court's reference to a "rule" did nothing more than invoke Rule 615.

_____

[5] Through complicated procedural circumstances discussed in the panel decision, see 196 F.3d at 215-16, two district judges presided over aspects of this case. To ascertain whether any local rules expanded the scope of Rule 615, we have reviewed the local rules of the Southern District of West Virginia -- where the trial judge then-presiding ordinarily sits -- and those of the Western District of North Carolina, where the case was tried. We find nothing in those local rules indicating that the "usual" rule differs in any respect from Rule 615.

Because the district court's order involved these two elements, our task here is to first ascertain whether either (1) Rule 615 or (2) the additional admonition that "the witnesses shall not discuss one with the other their testimony" proscribed the conversation Mr. Scofield had with Alexander. We begin with a review of Rule 615 -- an analysis that we undertake de novo.

C.

To determine whether Rule 615 proscribes the conduct of Mr. Scofield, we must first consider the language of the Rule itself, which provides:

> At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, or (4) a person authorized by statute to be present.

Fed. R. Evid. 615. It is clear from the plain and unambiguous language of Rule 615 that lawyers are simply not subject to the Rule. This Rule's plain language relates only to "witnesses," and it serves only to exclude witnesses from the courtroom. Thus, Rule 615 did not prohibit Mr. Scofield from discussing D. S. Davis's testimony with Corwin Alexander.[6]

The district court's bald Rule 615 order was then extended by the

_____

[6] Perhaps the most telling characteristic of the dissenting opinion crafted by my friend Judge Niemeyer is that its theoretical linchpin is announced without any supporting authority. That is, while his opinion references the Book of Susanna, the "wisdom of the ages," and "common sense," it cites no legal authority for the proposition that invocation of Rule 615 automatically prevents a witness from hearing, in any form whatsoever, anything contained in a prior witness's testimony. See post at 40-41.

10

statement that "the witnesses shall not discuss one with the other their testimony." Of course, nothing on the face of this extending language addresses the conduct of lawyers in any way. Moreover, the relevant authorities interpreting Rule 615, including court decisions and the leading commentators, agree that sequestration orders prohibiting discussions between witnesses should, and do, permit witnesses to discuss the case with counsel for either party: "Sequestration requires that witnesses not discuss the case among themselves or anyone else, other than the counsel for the parties." United States v. Walker, 613 F.2d 1349, 1354 (5th Cir. 1980) (emphasis added) (citing Gregory v. United States, 369 F.2d 185 (D.C. Cir. 1966)); accord United States v. Buchanan, 787 F.2d 477, 485 (10th Cir. 1986) ("The witnesses should be clearly directed, when [Rule 615] is invoked . . . that they are not to discuss the case . . . with anyone other than counsel for either side.") (emphasis added); 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 615.06 (Joseph M. McLaughlin, ed., 2d ed. 1998) ("[Sequestration] instructions, however, usually permit the witnesses to discuss their own or other witnesses' testimony with counsel for either side.") (emphasis added); 2 Charles A. Wright, Federal Practice & Procedure § 415 (2d ed. 1982) ("If exclusion is ordered, the witnesses should be instructed not to discuss the case with anyone except counsel for either side.") (emphasis added).[7]

In short, neither the bald invocation of Rule 615 nor the extending language relating to discussions between witnesses served to circumscribe the conduct of Mr. Scofield in any way.

_____

[7] We are aware of a single commentator who would endorse district court orders explicitly prohibiting witness contacts with attorneys: "While Rule 615 provides solely for the exclusion of witnesses from the courtroom, the court may take further measures . . . such as ordering [witnesses] . . . not to discuss the case with one another or with any attorney . . . ." Michael Graham, Federal Practice & Procedure, Federal Rules of Evidence § 6611, at 216 (interim ed. 1992). Notably, this statement is not supported by the single case that the treatise cites, Perry v. Leeke, 488 U.S. 272 (1989). In Perry, the Court held only that witnesses may be prohibited from speaking with lawyers between direct and cross examination; it did not approve the practice the treatise endorses, namely, generally prohibiting lawyer-witness contact as part of a sequestration order.

11

D.

The Government has conceded that neither the plain language of the district court's order, nor the provisions of Rule 615, prohibit any conduct by lawyers, and we note that "in all but the most extraordinary circumstance," the inquiry should end here. Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 475 (1992). Nonetheless, the Government asserts that the "purpose and spirit" of the sequestration order were compromised by Mr. Scofield's discussion with Alexander. Specifically, the Government contends that the "truth-seeking" process would be hindered if lawyers were permitted to reveal testimony in the manner exercised by Mr. Scofield. This is basically an argument that Rule 615, the extending language, or the policies underlying sequestration implicitly proscribed Mr. Scofield's conduct; we reject the argument for several reasons.

We have properly recognized the purpose and spirit underlying witness sequestration: it is "designed to discourage and expose fabrication, inaccuracy, and collusion." Opus 3 Ltd. v. Heritage Park, Inc., 91 F.3d 625, 628 (4th Cir. 1996). Put differently, sequestration helps to smoke out lying witnesses: "It is now well recognized that sequestering witnesses `is (next to cross-examination) one of the greatest engines that the skill of man has ever invented for the detection of liars in a court of justice.'" Id. (citing 6 Wigmore on Evidence § 1838, at 463).

To the extent that the Government asserts that Mr. Scofield frustrated the purpose and spirit of sequestration, we disagree. The Government asserts that Mr. Scofield's actions undermined the truthfulness of Alexander's testimony, which, in the Government's view, is surely an act that runs afoul of the sequestration order. On the contrary, lawyers are not like witnesses, and there are critical differences between them that are dispositive in this case. Unlike witnesses, lawyers are officers of the court, and, as such, they owe the court a duty of candor, Model Rules of Professional Conduct Rule 3.3 (1995) ("Model Rules"). Of paramount importance here, that duty both forbids an attorney from knowingly presenting perjured testimony and permits the attorney to refuse to offer evidence he or she reasonably believes is false. Id. Rule 3.3(a)(4), (c). Similarly, an attorney may not "counsel or assist a witness to testify falsely." Id. Rule

12

3.4(b). And, if an attorney believes that a non-client witness is lying on the witness stand about a material issue, he is obliged to "promptly reveal the fraud to the court." Id. Rule 3.3, cmt. 4. The Supreme Court has emphasized the importance of attorneys' duty of candor: "Any violation of these strictures would constitute a most serious breach of the attorney's duty to the court, to be treated accordingly." Geders v. United States, 425 U.S. 80, 90 n.3 (1976) (citing to parallel provisions of Model Code of Professional Responsibility). Consequently, lawyers' ethical obligations to the court distinguish them from trial witnesses.

Moreover, the purpose and spirit underlying sequestration are not absolute; indeed, we have aptly recognized that even the "powerful policies behind sequestration" must bend to the dictates of the Constitution. Opus 3 Ltd., 91 F.3d at 628.[8] Thus, to the extent that they are implicated in this case, the policies and spirit of sequestration must yield to the constitutional and ethical duties Mr. Scofield sought to effectuate here.[9] That is, in the context of a criminal trial like this one,

_____

[8] It is important to note that the language of Rule 615 does not require exclusion of all witnesses from the courtroom. While an absolute rule might further promote the truth-seeking policy behind Rule 615, constitutional considerations have required that exceptions be built into the Rule itself. Opus 3 Ltd., 91 F.3d at 628 ("confrontation and due process considerations" drive Rule 615's exceptions). Parties or their representatives, as well as expert witnesses, are authorized by Rule 615 to remain in the courtroom, hear testimony, and subsequently testify. Fed. R. Evid. 615(1)-(3). In criminal cases these exceptions are applied to allow the prosecution's case agent to remain at counsel table with the prosecutor, hear the other witnesses testify, and nevertheless testify on behalf of the prosecution. In this very case, moreover, the district court's sequestration order specifically exempted the Government's FBI case agent as well as its summary witness. See supra at 4.

[9] While it is unnecessary for us to reach the issue in this case, we observe that sequestration orders that prevent attorneys from performing their duties as counsel, including discussing trial proceedings with future witnesses, may well violate a criminal defendant's Sixth Amendment rights. The Supreme Court has explicitly forbidden some sequestration orders that prohibit a defendant-witness from conferring with counsel. Geders v. United States, 425 U.S. 80, 91 (1976); accord, United States v. Allen, 542 F.2d 630, 633 (4th Cir. 1976). And at least one court has

13

a defense attorney's duty to his client assumes constitutional stature: "In all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence." U.S. Const. amend. VI. To all clients, an attorney owes competence. Model Rules Rule 1.1. To fulfill this basic duty, the attorney must prepare carefully for the task at hand: "Competent representation requires . . . thoroughness and preparation reasonably necessary for the representation." Id. Rule 1.1(a).

Thorough preparation demands that an attorney interview and prepare witnesses before they testify. No competent lawyer would call a witness without appropriate and thorough pre-trial interviews and discussion. In fact, more than one lawyer has been punished, found ineffective, or even disbarred for incompetent representation that included failure to prepare or interview witnesses. United States v. Tucker, 716 F.2d 576 (9th Cir. 1983) (defense counsel ineffective for failing to interview witnesses); McQueen v. Swenson, 498 F.2d 207 (8th Cir. 1974) (same); In re Warmington, 568 N.W.2d 641, 668 (Wis. 1997) (lawyer disbarred for, among other things, "failing to supervise the preparation of an expert witness"); In re Wolfram, 847 P.2d 94, 96 (Ariz. 1993) (failure to interview witnesses cited among reasons for suspending attorney).

In this context, Mr. Scofield's actions were necessary in the exercise of his duties, both constitutional and ethical, as a lawyer. First, when the Government called Davis as a witness and began asking him questions about Alexander, Mr. Scofield made clear that he was unaware that Alexander had been implicated as a co-conspirator. See supra at 5. Although Davis's subsequent testimony did not implicate

_____

extended this reasoning to sequestration orders preventing counsel from discussing prior testimony with non-defendant witnesses:

> It has been held that to deprive a party . . . of the right to consult with counsel as the trial proceeds is to infringe its right to due process of law. This court believes that similar considerations apply to the right of a party to have his counsel free to discuss with prospective witnesses developments in the case, including the testimony of other witnesses.

United States v. Scharstein, 531 F. Supp. 460, 463-64 (E.D. Ky. 1982) (emphasis added).

14

Alexander in any specific drug deal, the import of Davis's allegation was clear: Alexander was serving as an intermediary between drug buyers and Rhynes. Faced with an allegation that his prime supporting witness, Alexander, had been assisting, or participating in, a drug conspiracy with Rhynes, Mr. Scofield had ethical (and possibly constitutional) duties to investigate these allegations with Alexander before he put Alexander on the stand. Mr. Scofield was thus compelled to ascertain, if possible: (1) whether Davis's allegations were untrue (or, if true, whether Alexander intended to invoke his Fifth Amendment rights); (2) whether Alexander's denials were credible; and (3) why Davis would make potentially false allegations against Alexander. Put simply, Mr. Scofield needed to fully assess his decision to call Alexander as a witness, and, to fulfill his obligations to his client, Scofield was compelled to discuss Davis's testimony with Alexander. See Chandler v. Jones, 813 F.2d 773 (6th Cir. 1987) (finding counsel's performance deficient for (1) failing to prepare witness for trial; (2) improperly using leading questions; and (3) calling witness who was expected to invoke the Fifth Amendment).

In response, the Government claims that Mr. Scofield did not violate the sequestration order by merely speaking with Alexander; instead, it was Mr. Scofield's informing Alexander of Davis's testimony that violated the order. Based on this view, the Government asserts that counsel had ample room to interview and prepare witnesses without running afoul of the sequestration order.**10** But this

_____

**10** Our distinguished Chief Judge, capturing a sentiment shared by Judge Niemeyer, claims that "Scofield himself commendably acknowledged to the district court that attorneys may fully prepare witnesses without revealing the details of prior testimony in contravention of a sequestration order." See post at 31-32; see also post at 38 ("Scofield approached the bench and acknowledged a violation of[Rule 615]."). This observation is both irrelevant and misguided. In actuality, Mr. Scofield's after-the-fact mea culpa demonstrates nothing more than an attorney commendably performing his duties to his client-- trying desperately to obtain reconsideration of an erroneous ruling in order to get his only supporting witness to the stand. If anything, Mr. Scofield assumed responsibility so that he, not his client, would be punished. In any event, Mr. Scofield's statements are irrelevant to the question of whether the sequestration order prohibited his conversation with Alexander.

15

conclusion begs the question, "How was counsel to discern the limits of the sequestration order?" Those limits -- as declared after the fact by the district court -- did not appear on the face of the order, in Rule 615, in controlling precedent, or even in persuasive authorities. In fact, adoption of the Government's position would make it virtually impossible for counsel to know whether they have "ample room" to perform essential tasks without violating an order.[11] This argument thus fails to persuade us.

Further, sequestration is not the only technique utilized to ensure the pursuit of truth at trial. Indeed, if an attorney has inappropriately "coached" a witness, thorough cross-examination of that witness violates no privilege and is entirely appropriate and sufficient to address the issue. In Geders, Chief Justice Burger, for a unanimous Court, endorsed cross-examination as the swift antidote for witness coaching:

> The opposing counsel in the adversary system is not without weapons to cope with "coached" witnesses. A prosecutor may cross-examine a defendant as to the extent of any "coaching" . . . . Skillful cross-examination could develop a record which the prosecutor in closing argument might well exploit by raising questions as to the defendant's credibility, if it developed that defense counsel had in fact coached the witness as to how to respond . . . .

Geders, 425 U.S. at 89-90.

In short, the Government's position requires the implication that by

_____

[11] Further, under the Government's argument, it apparently would have no problem if (hypothetically) Mr. Scofield had asked Alexander during trial preparation: "You sold drugs to Davis in August 1997, isn't that true?" On the other hand, the Government would take issue if Mr. Scofield had asked: "Davis testified that you sold drugs to Davis in August 1997. Is that testimony true?" The Government insists that, in such a case, Mr. Scofield would violate the "usual sequestration rule" because his question included the words: "Davis testified." The Government's argument fails because it is simply -- and unnecessarily -- splitting hairs.

16

discussing prior trial testimony with Corwin Alexander, Mr. Scofield necessarily coached Alexander or made it likely that Alexander would commit perjury.**12** To the contrary, we must trust and rely on lawyers' abilities to discharge their ethical obligations, including their duty of candor to the court, without being policed by overbroad sequestration orders. Furthermore, we are confident that, if an attorney is lax in his duty of candor, that laxness will normally be exposed -- even exploited -- by skillful cross-examination.

E.

Undeterred by the weight of contrary authority, the Government asserts that the district court's ruling that its order actually prohibited attorney-witness discussions of testimony is a permissible "interpretation" of the sequestration order. However, it is apparent that the district court was not interpreting its own order; rather, it was interpreting Rule 615. That is, the extending language of the sequestration order does not in any way relate to attorneys, and in each of the post-entry statements relating to the violation of its sequestration order, the district court clearly believed Rule 615-- not the extending language in its order -- had been violated. See supra at 9-11. In this context, reliance by the Government and my dissenting colleagues on the inherent discretion of a presiding judge is a red herring. We simply do not defer to a district court's legal interpretation of federal rules; those interpretations are reviewed de novo.

Further, the Government cites no authority for the proposition that an unadorned sequestration order, devoid of any reference to lawyers, nevertheless may be interpreted to prohibit lawyers from discussing trial proceedings with prospective witnesses. More importantly, if a district court does not exceed its discretion by interpreting a sequestration order in a manner that: (1) is unsupported by its text; (2) is unsupported by Rule 615; (3) is unprecedented in this circuit; (4) is contrary to the overwhelming weight of persuasive case law and scholarship; and (5) arguably unconstitutionally deprived the defendant of effective assistance of counsel, then the district court's discre-

_____

**12** For the sake of clarification, we note that nothing in the record even remotely suggests that Mr. Scofield improperly coached Alexander or encouraged him to commit perjury.

17

tion to interpret its orders is effectively limitless. As a practical matter, our adoption of the Government's position would permit trial judges, when faced with any trial activity they dislike, not only to order it stopped prospectively, but to <u>punish</u> it as if it were a violation of a then-existing order. Such post-hoc exercises of regulatory power are wholly inconsistent with our system of justice. <u>See generally Kaiser Aluminum & Chem. Corp. v. Bonjorno</u>, 494 U.S. 827, 855 (1990) (Scalia, J., concurring) ("The principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal.").**13**

Given the constitutional significance of the duties Mr. Scofield was obliged to carry out, we simply cannot agree that the district court was within its discretion to hinder his performance of those duties with an expansive, unprecedented, and after-the-fact "interpretation" of a rule of evidence. To the contrary, where an attorney seeks to perform his constitutionally mandated duty to effectively represent a criminal defendant, he must be free to interview defense witnesses and to discuss with them all appropriate matters, without being subjected to an overbroad sequestration order.

F.

While the district court concluded that Mr. Scofield violated the sequestration order, we are unable to find any such violation and conclude that there was none. As a result, the district court's decision to exclude Alexander on the basis of a non-existent violation was an error of law and, thus, an abuse of discretion. <u>See Koon v. United</u>

_____

**13** Our decision today does not, in any way, diminish a district court's authority to enter a sequestration order, under appropriate circumstances, that exceeds the scope of Rule 615. If a district court, in its discretion, determines to grant a sequestration order that exceeds the express bounds of Rule 615, the order should at least: (1) be explicit; (2) be of record and timely; and (3) be tailored as narrowly as possible to achieve its purposes without hindering counsel in performance of their duties to clients and the court. Such criteria seem especially prudent in light of the "confusion about how far the scope of a bald Rule 615 order extends for the sanction of excluding testimony." <u>United States v. McMahon</u>, 104 F.3d 638, 648 (4th Cir. 1997) (Michael, J., dissenting).

18

States, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law.").

III.

Even if Mr. Scofield had violated a sequestration rule or order, we would still hold, in the context of this case, that the sanction imposed -- exclusion of Alexander's testimony -- constituted reversible error.[14] "Because exclusion of a defense witness impinges upon the right to present a defense, we are quite hesitant to endorse the use of such an extreme remedy." United States v. Cropp, 127 F.3d 354, 363 (4th Cir. 1997). Under these circumstances, we conclude that exclusion of Alexander's testimony in its entirety was unduly severe.

At the outset, sanction analysis must encompass proportionality, and sanctions as extreme as witness exclusion must be proportional to the offense. Cf. Doyle v. Murray, 938 F.2d 33, 34 (4th Cir. 1991) ("[S]anctions [must] be fixed in proportion to the severity of a party's or lawyer's misconduct[.]"). In this case, when the district court excluded Alexander's testimony, it was aware, through Mr. Scofield's representations, that Alexander had been exposed to Davis's accusation that Alexander was involved in drug deals. However, the district court conducted no examination of Alexander to determine exactly what he had been told; neither did the court attempt to ascertain through Mr. Scofield what he had revealed to Alexander.

More importantly, the proffer of Alexander's testimony covered at least six other Government witnesses and a number of other topics that were crucial to Rhynes's defense. Mr. Scofield specifically represented that, "Your Honor, I do not believe, as I stand here and think about it, that I mentioned anybody else's testimony other than D. S. Davis." See supra note 4. Notwithstanding this representation, the district court determined that Alexander's testimony relating to each of the other Government witnesses and other subjects was tainted by the same "coaching" as the testimony relating to D. S. Davis. Significantly, the court apparently made this determination based solely on

_____

[14] We review the district court's choice of a sanction under these circumstances for an abuse of discretion. United States v. Cropp, 127 F.3d 354, 363 (4th Cir. 1997).

19

Mr. Scofield's proffer, see supra at 7-8, but on this record, the court's finding of taint with respect to the other witnesses and other subjects is simply unsubstantiated. The exclusion of Alexander's testimony in its entirety was thus unduly severe and disproportionate to the narrow scope of Mr. Scofield's apparent violation.

We must also reject the Government's contention that, in the circumstances of this case, the sanction was justified and proportional because the "search for truth" was thereby furthered. We agree, for example, that if Alexander had been permitted to testify and his testimony had contradicted Davis's testimony, then one-- either Alexander or Davis -- was not, in all likelihood, testifying truthfully. However, the adversary system ordinarily can be trusted to separate the liars from the truthful. In this instance, the search for truth would have been better served by permitting the jury to determine who was telling the truth. By contrast, the district court's exclusion of Alexander's testimony left Davis's testimony uncontradicted and may have led the jury to believe, and rely upon, untruthful testimony. Put simply, excluding Corwin Alexander as a witness did nothing to further the search for truth.

Further, the degree of fault or intent encompassed in the violation must be considered in ascertaining the propriety of any given sanction. See United States v. English, 92 F.3d 909, 913 (9th Cir. 1996) ("One factor given considerable weight in determining what sanction, if any, is appropriate for the violation of a sequestration order is whether the side calling the witness deliberately violated the court's order."). Given the lack of legal support for the district court's broad interpretation of its order, it is obvious that Mr. Scofield did not intend to violate the sequestration order. When questioned about his discussions with the witness Alexander in preparation of the defense, he was clear about his actions: "I specifically told [Alexander] about that testimony and told him I was going to ask him about that, Your Honor. And I don't think that violates the sequestration order." J.A. 1945M. An inadvertent misstep by Mr. Scofield was simply insufficient to justify the extreme sanction imposed on Rhynes.

We are also cognizant that although the alleged violation of the sequestration order was effected by Mr. Scofield, the sanction

20

imposed inured to the defendant.**15** There was, of course, no requirement that Rhynes be sanctioned for his lawyer's conduct; indeed, a lawyer may be personally sanctioned for violations of court orders. If, however, a defendant is being sanctioned for his lawyer's conduct, courts should impose the least severe sanction justified under the circumstances. The district court had alternative sanctions at its disposal; we have endorsed at least two others: "sanction of the witness; [and] instructions to the jury that they may consider the violation toward the issue of credibility." Cropp, 127 F.3d at 363. Further, there were many other possible corrective measures that could have been taken, including: limiting the scope of the witness's testimony, see English, 92 F.3d at 913 (endorsing limitation of witness's testimony following violation of sequestration order); permitting broad cross-examination into the alleged "coaching," see United States v. Posada-Rios, 158 F.3d 832, 871-72 (5th Cir. 1998); or any other sanction appropriate under the circumstances. There is no doubt that, under facts like these, the district court could have imposed a less severe sanction.

In short, even had Mr. Scofield's contact with Alexander violated the sequestration order, the district court abused its discretion in imposing the unduly severe sanction of excluding Alexander's testimony in its entirety.

IV.

While harmless error analysis applies to the district court's error, we are satisfied that the erroneous exclusion of Michael Rhynes's sole corroborating witness, who would have sought to rebut much of the Government's evidence against Michael Rhynes, was not harmless. We have here an error of constitutional magnitude-- a deprivation of Michael Rhynes's Sixth Amendment right to call witnesses on his behalf.**16** For this constitutional error to be harmless, the Government is required to establish, to the satisfaction of this Court beyond a reasonable doubt, "that a rational jury would have found the defendant

_____

**15** There has been no allegation that Rhynes participated in this alleged violation in any way.

**16** "In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor[.]" U.S. Const. amend. VI.

21

guilty absent the error." <u>Neder v. United States</u>, 527 U.S. 1, 18 (1999). When, as here, guilt "was genuinely contested, and there is evidence upon which a jury could have reached a contrary finding, the error is not harmless." <u>United States v. Brown</u>, 202 F.3d 691, 701 (4th Cir. 2000).

We need not dwell long on this question because it is clear that the erroneous exclusion of Alexander's testimony was not harmless. Indeed, at the en banc argument in this case, Government counsel conceded as much, candidly acknowledging that, if Alexander's testimony had been believed -- an assumption we must make in assessing harmless error, Michael Rhynes would have been found not guilty.

We agree with the Government. As Mr. Scofield's unchallenged proffer of Alexander's testimony made clear, Alexander would have sought to corroborate myriad details of Michael Rhynes's own testimony, to discredit several of the Government's witnesses, and to counter a number of the inferences the Government sought to draw from its evidence. <u>See supra</u> at 7-8. When he lost Alexander as a witness, Michael Rhynes lost the opportunity to independently challenge the Government on all of these issues. Faced with an error with such consequences, we are constrained to conclude that this error was not harmless.

V.

Pursuant to the foregoing, we vacate Michael Rhynes's conviction and sentence and remand his case to the district court for a new trial.

<u>VACATED AND REMANDED</u>

WIDENER, Circuit Judge, concurring:

I concur in the result and in Parts I, II, IV, and V of Judge King's opinion, except, perhaps, n.11, slip at 16, and will explain below.

Finding that the exclusion of the testimony of the witness was reversible error, I believe it unnecessary and thus do not express an opinion on the matters addressed in Part III of the opinion.

22

I should add that asking, in terms, one witness to comment on the testimony of another witness is a practice so uniformly disapproved as not to bear citation. See n.11, slip at 16. So the real prejudicial error in the decision of the district court, as Judge King's opinion points out, was preventing the defense attorney from discussing the substance of the previous testimony with the upcoming witness, not the form of the question, which, as the government and n.11 point out, could easily have been avoided by simply changing the wording of the question, a matter of no more moment than changing the form of a leading question by substituting the familiar "State whether or not . . . ."

So far as this concurrence may be at odds with it, then, I may not agree with n.11.

WILKINS, Circuit Judge, concurring in part and concurring in the judgment:

I concur in the judgment that Rhynes' conviction and sentence be vacated and his case remanded for a new trial, and in what Judge King has written in Parts III and IV of his opinion. The district court plainly abused its discretion in excluding the testimony of defense witness Alexander. And, this error was harmful. Consequently, proper resolution of this appeal can be achieved without addressing the more difficult question of whether defense attorney Scofield actually violated the sequestration order.

As Judge King points out, see ante at 5, when Alexander stated, "[A]nd I hear from Tuesday [Davis] got up and said . . ." the Government immediately objected. A bench conference and a meeting of counsel and the district judge in chambers took place. As to what was said by Scofield to sequestered witness Alexander, the record contains only Scofield's representation to the court. A fair reading of his representation indicates that his conversation with Alexander was limited to relating the accusation made by Davis from the witness stand that Alexander was a drug dealer. If this is truly what happened, exclusion of Alexander's testimony was a sanction totally disproportionate to any possible violation of the sequestration order. Alternatively, while an on-the-record inquiry may have uncovered facts sufficient to support a conclusion that the asserted violation of the sequestration order

23

was sufficiently egregious to justify the extreme sanction of exclusion, the failure to conduct such an inquiry before imposing the sanction was itself an abuse of discretion.

I.

Sequestration of trial witnesses serves the important purpose of "discourag[ing] and expos[ing] fabrication, inaccuracy, and collusion." Opus 3 Ltd. v. Heritage Park, Inc., 91 F.3d 625, 628 (4th Cir. 1996); see United States v. McMahon, 104 F.3d 638, 643 (4th Cir. 1997) (noting that sequestration of witnesses "prevent[s] the possibility of one witness shaping his testimony to match that given by other witnesses at the trial" (internal quotation marks omitted)). Next to cross-examination, sequestration is "one of the greatest engines that the skill of man has ever invented for the detection of liars in a court of justice." Opus 3 Ltd., 91 F.3d at 628 (internal quotation marks omitted).

Given the importance of sequestration to the truth-finding process, the violation of a sequestration order should not be taken lightly. However, depending on the situation, numerous means exist to correct violations when they occur. For example, the court may grant opposing counsel broad latitude in cross-examination in order to expose the extent of any taint resulting from the violation. See United States v. Eyster, 948 F.2d 1196, 1211 (11th Cir. 1991). The court may also instruct the jury that the violation of the sequestration order is relevant in determining the witness' credibility. See United States v. Cropp, 127 F.3d 354, 363 (4th Cir. 1997). In some cases, it may be appropriate to sanction the offending witness directly. See id.; McMahon, 104 F.3d at 642 (noting that "[i]t has long been established that a judge may find a person who violates a sequestration order in contempt of court"). Additionally, the extreme sanction of exclusion of witness testimony is sometimes an appropriate remedy for violation of a sequestration order. See Cropp, 127 F.3d at 363.

Although exclusion of witness testimony is an available remedy for violation of a sequestration order, it is not a favored one. See Holder v. United States, 150 U.S. 91, 92 (1893) (observing that a witness who has violated a sequestration order "is not thereby disqualified [from testifying], and the weight of authority is that he cannot be

24

excluded on that ground" alone, although exclusion may be warranted in some cases); Cropp, 127 F.3d at 363 (expressing hesitation "to endorse the use of such an extreme remedy" as exclusion); see also Department of Energy v. White, 653 F.2d 479, 490 (C.C.P.A. 1981) (characterizing exclusion as a "draconian remedy," the damage of which in that case "outweigh[ed] any possible harm of supposedly tainted evidence"). Indeed, because the exclusion of a defense witness implicates the defendant's due process right to present testimony in his own defense, exclusion should be reserved for those instances in which violation of the sequestration order resulted from intentional misconduct by the defendant or defense counsel. See United States v. Hobbs, 31 F.3d 918, 922 (9th Cir. 1994); see also Rowan v. Owens, 752 F.2d 1186, 1191 (7th Cir. 1984) (noting that exclusion "might, by making it impossible for the defendant to put on a meritorious defense, be a disproportionate sanction for . . . violation" of a sequestration order).

## II.

### A.

Assuming that Scofield related only Davis' allegation that Alexander was a drug dealer, in view of the nature of the asserted violation, the minor effect of any violation on the truth-finding process, and the severe potential impact of the exclusion of Alexander's testimony on Rhynes' ability to meet the charges against him, the district court abused its discretion in excluding Alexander's testimony. First, the violation, even if one occurred, was not an egregious one. Davis testified that Alexander was involved in dealing narcotics. Understandably, defense counsel Scofield was very interested in ascertaining how his only witness would react when confronted with this accusation--would he deny it, admit it, or refuse to respond, perhaps asserting his Fifth Amendment right against self-incrimination? Thus, there can be no doubt that competent counsel would have asked Alexander about the subject of Davis' testimony, and under the circumstances there can be little question that even the most carefully phrased question would have alerted Alexander--or any person of normal intelligence--to the fact that the allegation had probably been made in trial testimony. Any possible violation of the sequestration order occurred solely because Scofield used the words "Davis testi-

25

fied" rather than some more neutral phrasing; indeed, no one suggests that Scofield would have violated the sequestration order by asking even a very pointed question that did not identify Davis' testimony as the source of the allegation. Additionally, it appears from Scofield's representation that his conversation with Alexander was a product of a misunderstanding of the scope the district court intended its order to have, a fact which further lessens the severity of any violation. Cf. Miller v. Universal City Studios, Inc., 650 F.2d 1365, 1373-74 (5th Cir. 1981) (affirming exclusion of witness as remedy for "a clear and intentional" violation of a sequestration order).

Second, the asserted violation did not threaten to undermine the purpose of the sequestration order, namely, the prevention of collusion and fabrication. The district court was not faced with a situation in which one witness' testimony regarding key facts was related to a sequestered witness, giving the latter an opportunity to tailor his testimony to the prior testimony. In such a case, exclusion might well be an appropriate remedy, particularly when the extent to which the witness' testimony has been tainted cannot be determined. Here, in contrast, the alleged violation of the sequestration order provided no opportunity for Alexander to tailor his testimony to that of any other witness. Rather, Alexander simply responded to impeachment testimony by Davis. See United States v. Shurn, 849 F.2d 1090, 1094 (8th Cir. 1988) (explaining that impeachment testimony does not implicate the purpose of Rule 615 to prevent tailored testimony).

Finally, any violation of the sequestration order affected only a limited portion of Alexander's testimony. Alexander testified on a number of matters. In particular, he testified to the existence of legitimate sources for Rhynes' purportedly unexplained wealth (which the Government contended was derived from drug dealing) and corroborated Rhynes' testimony regarding a trip to New York. Additionally, Alexander impeached several Government witnesses, including Davis. None of this testimony could have been tainted by the asserted violation of the sequestration order.

Based on the foregoing considerations, I agree with Judge King that the district court abused its discretion in excluding Alexander's testimony. Given the relatively minor nature of the asserted violation, the absence of a significant denigration of the truth-finding process,

26

and the limited extent of any potential prejudice, remedies other than complete exclusion of Alexander's testimony would have been wholly adequate. In my view, it would have been adequate, for example, for the district court to allow the Government free rein to cross-examine Alexander regarding his discussions with Scofield. Cf. United States v. Posada-Rios, 158 F.3d 832, 871-72 (5th Cir. 1998) (holding that refusal to strike testimony for violation of sequestration order was not abuse of discretion when opposing party was provided with full opportunity to cross-examine witness), cert. denied, 526 U.S. 1137, 526 U.S. 1031, and 119 S. Ct. 1487 (1999). Exclusion was not necessary, and under the circumstances was excessive.

B.

On the other hand, statements by the district court indicate that it may have been under the impression that a great deal more of Davis' testimony was related to Alexander than just the allegation that Alexander was a drug dealer. It may be that the decision of the district court to exclude Alexander's testimony was based on this impression. However, the record was not developed and a factual foundation laid to support such a conclusion. Further exploration of this important issue on the record was unquestionably required before imposing the extreme sanction of excluding Alexander's testimony in its entirety.

While I fully recognize that appellate judges review the decisions of our colleagues on the trial bench with 20/20 hindsight, it is clear that before excluding Alexander's testimony the district court should have excused the jury and questioned Alexander about the extent and detail of his conversation with Scofield while sequestered. If necessary, Scofield should have been required to submit to examination as well. The failure to conduct such an inquiry rendered the record on appeal woefully inadequate, for the pertinent facts were simply not ascertained. And, the district court was in the same position as we are now--i.e., lacking sufficient information as to the actual extent of Scofield's conversation with Alexander--when it decided to exclude Alexander's testimony.

Thus, regardless of which scenario is addressed, the result in each is that Alexander's testimony should not have been excluded.

27

Judge Williams and Judge Traxler have asked to be shown as joining in this opinion.

LUTTIG, Circuit Judge, concurring:

I fully agree with Judge King that the order entered by the district court cannot possibly be read to reach the lawyer's conduct in this case and I concur in those portions of his opinion in which he so holds. I believe Judge King is also unquestionably correct in his interpretation of Federal Rule of Evidence 615. However, I do not believe it is even necessary to reach the question of the proper interpretation of that rule, given that counsel's conduct so plainly did not violate the district court's order. Only if counsel's conduct had violated the terms of the order might we be confronted with the questions of the proper interpretation of Rule 615 and whether the district court exceeded its authority under that rule in entering its sequestration order, or with the larger constitutional questions implicating the Sixth Amendment.

Neither of our colleagues in dissent addresses the text of the district court's order. The sole issue in this case, however, is whether counsel violated the terms of the district court's order. And it is the language of that order that must dictate our conclusion, not our general sense as to whether the "spirit" of the order was violated. The order, which the district court held <u>counsel</u> violated, reads as follows:

> Well, I do grant the usual sequestration rule and that is that <u>the witnesses shall not discuss one with the other their testimony</u> and particularly that would apply to those witnesses who have completed testimony not to discuss testimony with prospective witnesses, and I direct the Marshal's Service, as much as can be done, to keep those witnesses separate from the -- those witnesses who have testified separate and apart from the witnesses who have not yet given testimony who might be in the custody of the marshal.

Under no legitimate method of interpretation could this order be interpreted to extend to counsel. By its plain terms, the order prohibits "witnesses" from discussing their testimony "one with the other." That the order's reach is limited to witnesses, and specifically discussions between or among witnesses, is also apparent from the order's

28

conforming instruction to the Marshal's Service to ensure that "those witnesses who have testified [are kept] separate and apart from the witnesses who have not yet given testimony." Not even the government was willing to argue that the terms of the district court's order were violated by counsel's conduct; when pressed, the government would say at most only that "the spirit" of the order might have been violated.

We sit to determine whether laws have been violated, not to assess whether "the spirit" of a law has somehow been offended. In my view, for a judicial body either to punish or to deprive based upon perceived offense to a "spirit" of an enactment or a judicial order is nothing short of the denial of due process.

While this case might be dismissed as relatively insignificant in the grand scheme of things, I actually believe that it is quite significant for the insight that it offers as to how one views the law. I believe that there is nothing more important than that the courts themselves be bound by the language of their own orders and opinions. For if we are unwilling ourselves to be bound by what we write, then we forfeit our authority to insist that others be bound by our writing. If we are to insist upon obedience to the language of law, then we must likewise be obedient -- always, but especially when such obedience yields a result with which we disagree. Obedience to the language of law is not to engage in "clever wordplay" or to indulge in "literalistic construction," and it must never be mistaken as such. It could not be further from these. It is, rather, the very essence of law.

WILKINSON, Chief Judge, dissenting:

I respectfully dissent. I do so because I believe a district court must have broad discretion not to permit a tainted witness to testify.

The district court acted to protect the integrity of the trial proceedings before it. In the face of the court's sequestration order, Michael Rhynes' attorney directly related to a defense witness the earlier testimony of a significant prosecution witness. The district court did not abuse its discretion in finding this to be a violation of its sequestration order or in excluding the testimony of the tainted witness in the aftermath of the defense attorney's clear violation of the order. By finding

29

an abuse of discretion, this court has invaded the province of the trial court and impaired the ability of district judges to preserve the integrity of the truth-finding process.

I.

The relevant facts of this case are straightforward. The district court issued a sequestration order at the outset of this multi-defendant criminal trial, the text of which is set forth in Judge King's opinion. During the testimony of defense witness Corwin Alexander, it came to light that Rhynes' attorney, Michael Scofield, had discussed with Alexander the prior testimony of prosecution witness D. S. Davis. While on the stand, Davis had implicated Alexander in Rhynes' drug dealing activities. Davis' testimony thus threatened to undermine the credibility of Alexander's exculpatory testimony on Rhynes' behalf.

Once Alexander indicated that he had heard about Davis' prior testimony, the government promptly objected. At the subsequent bench conference, Scofield admitted that he had specifically told Alexander about Davis' testimony but protested that he did not think that conversation violated the sequestration order. The district court found that Scofield had violated the order and that his conduct was unprofessional. The court then excused the witness and instructed the jury to disregard his testimony. After a recess, Scofield conceded that he had violated the sequestration order and described what he should have done instead so as not to run afoul of the order. Following a proffer of the remainder of Alexander's testimony, the court stood by its original ruling and noted that Scofield's proffer "would certainly lead this judge to conclude that my Rule 615 order was violated as to the testimony of many witnesses."

In light of these circumstances, the district court properly found that Scofield had violated the sequestration order. As Judge Niemeyer explains in his opinion, Scofield's conduct directly violated the court's sequestration order, as Rule 615 admits of no exception that entitles attorneys to act as couriers of prior testimony to prospective witnesses. The district court should be commended, not chastised, for refusing to recognize an exception to Rule 615 that does not exist and for acting to preserve trial proceedings as a means of ascertaining truth.

30

Trial courts are not required to stand idly by while attorneys circumvent court orders in the name of professional privilege. Indeed, the Supreme Court has stated that "[i]f truth and fairness are not to be sacrificed, the judge must exert substantial control over the proceedings." Geders v. United States, 425 U.S. 80, 87 (1976). This is exactly what the district court did here. The court was confronted with a multi-defendant criminal conspiracy and was thus on heightened alert to the risk of conduct such as witness coaching and the tailoring of testimony. The sequestration order was aimed at preventing precisely these ills from infecting the trial.

Scofield's conduct, however, utterly thwarted the sequestration order. A sequestration order is "a product of common sense and its purpose is obvious." United States v. McMahon, 104 F.3d 638, 644 (4th Cir. 1997) (internal quotation marks omitted). It has no conceivable object other than to prevent prospective witnesses from knowing the testimony of prior witnesses before taking the stand themselves. See United States v. Leggett, 326 F.2d 613, 613 (4th Cir. 1964) (per curiam). Yet Scofield's actions accomplished this prohibited end as surely as if Alexander had heard Davis' testimony in the courtroom himself. This was a matter of no small concern to the district court. Davis' testimony was extremely problematic for Alexander, because Davis had linked Alexander to Rhynes' drug-dealing activities. Foreknowledge of Davis' testimony would enable Alexander to counter these allegations with greater credibility, specificity, and force. The district court was understandably troubled when it learned that Scofield had related Davis' testimony to Alexander. The court was not compelled to countenance Scofield's conduct any more than it was required to permit Alexander to hire a courtroom scribe to record prior testimony, see McMahon, 104 F.3d 638, or read trial transcripts of what earlier witnesses said, see Miller v. Universal City Studios, Inc., 650 F.2d 1365 (5th Cir. 1981).

Nor did the district court's ruling impair Scofield's ability to discharge his professional obligations to thoroughly prepare his witnesses. It should go without saying that attorneys do not require a privilege to violate valid court orders in order to serve their clients with competence and zeal. To argue that the district court's ruling impermissibly ties attorneys' hands is both gross overstatement and a red herring. Indeed, Scofield himself commendably acknowledged

31

to the district court that attorneys may fully prepare witnesses without revealing the details of prior testimony in contravention of a sequestration order:

> Your Honor, as I told you in chambers, I now realize that the proper thing for me to do in interviewing Alexander and preparing him to testify was that I could have asked him all the details of whether he had been a dealer and whether he had done drug deals with Michael Rhynes and that sort of thing without telling him that Davis had said that he had done that.

While it is tempting to dismiss this explanation as part and parcel of a compulsory mea culpa, Scofield's words in fact speak for themselves. And there is nothing wrong with expecting attorneys, as officers of the court, to respect the boundaries that trial courts establish. Scofield should have realized previously that his conduct would frustrate the court's order. He also could easily have asked the district court to clarify the scope of its order before he pressed the envelope. Violation of a sequestration order that the defense itself had requested understandably disturbed the district court.

The district court did not abuse its discretion in excluding Alexander's testimony. It is well settled that a trial court's choice of remedy when a sequestration order has been violated is entrusted to the trial court's discretion. See, e.g., United States v. Cropp, 127 F.3d 354, 363 (4th Cir. 1997); Leggett, 326 F.2d at 614; United States v. Avila-Macias, 577 F.2d 1384, 1389 (9th Cir. 1978).

Before today, there was "no precedent in which we[had] overturned the decision of a district judge to exclude a defense witness when the violation was plainly the fault of the defendant or defendant's counsel." Cropp, 127 F.3d at 363. Indeed, we have traditionally reserved the exclusion remedy for precisely those situations where, as here, it is the party or his counsel who causes the infraction. See id.

For example, in Cropp, we found no abuse of discretion in a situation where, as here, "the right to present a defense ha[d] come into direct conflict with the protection against tainted testimony." Id. In that case, it became apparent during the testimony of defense witness

32

Chris Carter that defendant Monte Mosley violated the sequestration order by talking to Carter before Carter took the stand. This court noted that "[a]lthough Mosley denies it, it is possible that Mosley in fact told Carter that there had been previous testimony that Carter had purchased crack from Mosley on numerous occasions." Id. Even though this court believed that the district court "would have been well advised to employ a lesser sanction" and "should perhaps have more closely examined Carter in voir dire," we nonetheless declined to take the unprecedented step of overturning the district court's exclusion remedy on abuse of discretion grounds where the defendant or his counsel was at fault. Id.

We should likewise refuse to upset the district court's exercise of its discretion in the instant case. Defense counsel was plainly the cause of the violation and admitted as much at trial. As noted earlier, Davis was the single most problematic witness from Alexander's point of view, so it was undoubtedly to Alexander's advantage to know Davis' testimony before taking the stand. Although the district court did not conduct a voir dire of Alexander, it did receive a proffer of Alexander's testimony. After listening to this proffer, the district court saw no reason to rescind its exclusion remedy, but rather was concerned that the violation of the sequestration order may have been even more far-reaching than it originally appeared. Given these circumstances, I simply cannot say that the district court abused its discretion. What should be a simple and straightforward matter of upholding a trial court's evidentiary ruling with respect to tainted testimony has become an exercise in appellate mischief.

II.

The majority interposes appellate courts into the most sensitive aspects of trial management. It is for good reason that evidentiary decisions are committed to the discretion of the district court. Cf. General Elec. Co. v. Joiner, 522 U.S. 136, 141 (1997); United States v. Ham, 998 F.2d 1247, 1252 (4th Cir. 1993). "[T]rial judges are much closer to the pulse of a trial than [appellate judges] can ever be . . . ." United States v. Tindle, 808 F.2d 319, 327 n.6 (4th Cir. 1986) (alteration in original) (internal quotation marks omitted). Trial judges are charged with and are uniquely capable of preserving the integrity of a trial. See Geders, 425 U.S. at 86-87. Our respect for their judg-

33

ment is thus all the more important when the truthfulness of witness testimony is at stake, for a trial is by its very nature "a search for truth," Nix v. Whiteside, 475 U.S. 157, 166 (1986). Trial courts are also in the best position to interpret their own orders and are entitled to inherent deference when they construe those orders. See Vaughns v. Board of Educ., 758 F.2d 983, 989 (4th Cir. 1985); Anderson v. Stephens, 875 F.2d 76, 80 n.8 (4th Cir. 1989). By usurping the role of the district court, this court impairs the ability of trial judges to ensure the integrity of trial proceedings.

My good colleagues are treading some treacherous paths. Judge King's opinion would subject the sequestration orders of a trial court to the strictest canons of statutory construction. See ante at 10 ("[the] Rule's plain language relates only to `witnesses'"); id. at 10 ("nothing on the face of this extending language addresses the conduct of lawyers in any way"); id. at 10 ("It is clear from the plain and unambiguous language of Rule 615 . . . ."). Nothing in the above discussion of Rule 615 renders this order any less the order of a trial court.* In undercutting the trial court's construction of its own order, the plurality would allow attorneys to construe trial court orders in the most permissive light possible, even where such construction plainly and

_____

*My brother King seeks to buttress his second-guessing of the trial court by converting the district court's interpretation of its sequestration order into a matter of law to be reviewed de novo. See ante at 10-11. For the reasons that Judge Niemeyer and I have explained, the district court's finding that Scofield violated the order easily passes muster under this more searching standard of review. Nonetheless, it is difficult to discern how a sequestration order entered pursuant to Rule 615, which primarily authorizes a court to enter such an order, somehow ceases to be the court's own order simply because the court invokes Rule 615. The plurality's argument to this effect contravenes our obligation to accord a district court's interpretation of its own order the deference it is due. See Anderson, 875 F.2d at 80 n.8; see also United States v. Shurn, 849 F.2d 1090, 1094 (8th Cir. 1988) ("The trial court is given broad discretion in the interpretation of Rule 615."); McKee v. McDonnell Douglas Technical Servs. Co., 700 F.2d 260, 262 (5th Cir. 1983) ("Allowing the sequestration of witnesses is imparted to the discretion of the trial judge. It is equally within his discretion to determine whether the separation mandate has been violated and, if so, what sanctions, if any, should be imposed.").

34

utterly frustrates the purpose of the order. Attorneys could then immunize themselves by employing clever wordplay to justify post hoc their behavior to appellate courts. I would not deprive trial courts of the necessary latitude to ensure that the truth does not routinely become the victim of sandbagging and cramped word games. Nor would I supplant our customary rule of deference to a trial court's reasonable interpretation of its own order with a rule of deference to an attorney's literalistic construction of the same.

My brother Luttig contends that to defer to the district court's interpretation of its own order is to forsake the textualism that properly guides us in the task of statutory construction. This contention is misplaced. The differences between our duty in interpreting a statute and our task in reviewing a district court's interpretation of its own order are significant. It is not possible for us to obtain the views of 100 senators and 435 House members in discerning the meaning of a federal statute. By contrast, it is entirely possible for an attorney to obtain an explanation of an order from a single trial judge, an explanation that is there for the asking. In the pursuit of pure textualism, my brother Luttig supplants the cooperation that should obtain between the bench and bar with a more antagonistic relationship based on exploiting trial court orders for every loophole and imprecision. Just as departing from text undermines the rule of law in the course of statutory interpretation, so too will stripping a district court of the ability to enforce its orders undermine the rule of law at trial.

My brother Wilkins would thrust appellate courts into much too close a supervisory role over the remedial judgments of a district court when a sequestration order has been violated. Judge Wilkins would effectively substitute a carefully calibrated test of proportionality for the abuse of discretion standard in assessing whether the district court employed a permissible remedy. While an appellate judge may wish in hindsight that the district court had conducted a more extensive voir dire or taken a different remedial tack, appellate courts should be reluctant to delve deeply into the business of conducting trials. For example, the choice between excluding a compromised witness' testimony and allowing the witness to be cross-examined is a classic one for the trial court in determining how best to facilitate the truth-finding function.

In overturning the district court, we not only upset the balance between trial and appellate courts, we strike at the soul of the judicial process. Alexander Hamilton pointed out long ago that the judiciary "has no influence over either the sword or the purse." The Federalist No. 78, at 465 (Clinton Rossiter ed., 1961). Possessing "neither force nor will," we have "merely judgment." Id. And faith in our judgment will rise and fall on the degree to which our processes represent a search for truth. If attorneys can inform subsequent witnesses of prior testimony, trials themselves will become more choreographed performances than spontaneous events. When an en banc appellate court brings a trial court up short on a routine evidentiary matter where the trial court's actions were consistent with the Federal Rules, circuit precedent, and its own order, we create a state of affairs we shall come to lament.

By according Scofield every benefit of the doubt while at the same time viewing the district court's actions in the most unfavorable light possible, the majority subtly shifts control of trial proceedings from the trial court to the hands of advocates. This is a shame. The job of managing complex criminal litigation is difficult enough even with the supportive standards of appellate review. When circuit courts disregard the deference mandated by those standards, the trial judge's task becomes one of responsibility without authority. I would not impose on district courts this inordinate burden.

I am authorized to say that Judge Niemeyer joins me in this dissent.

NIEMEYER, Circuit Judge, dissenting:

The plurality's interpretation of Federal Rule of Evidence 615, which would create an attorney exception to the rule, is contrary to precedent and common sense. In misconstruing the rule, the plurality would substantially frustrate its purpose and effect.

Because I believe that the district court's interpretation of Rule 615 was reasonable and consistent with the customary interpretation of the rule and that the court's finding that counsel for the defendant violated the rule is supported by the record, I would affirm the district court's conclusion that counsel violated its sequestration order. With respect to the remedy, while I believe that the court, in the exercise

36

of its discretion, might have better articulated its consideration of the full range of available sanctions before excluding the witness' testimony, for the reasons given by Chief Judge Wilkinson, I conclude that the exclusion of the witness' testimony fell within the discretion conferred upon district courts to administer Rule 615.

I

At the outset of this criminal trial, counsel for one of the seven defendants in this case invoked Federal Rule of Evidence 615 to have witnesses sequestered during trial. Accordingly, the district court stated in open court:

> Well, I do grant the usual sequestration rule and that is that the witnesses shall not discuss one with the other their testimony and particularly that would apply to those witnesses who have completed testimony not to discuss testimony with prospective witnesses, and I direct the Marshal's Service, as much as can be done, to keep those witnesses separate from the -- those witnesses who have testified separate and apart from the witnesses who have not yet given testimony who might be in the custody of the marshal.

In presenting Michael Rhynes' defense, Rhynes' counsel, Michael Scofield, called Corwin Alexander as a witness. Alexander was questioned about D. S. Davis, a witness who had testified during the government's case. In the course of answering these questions, Alexander began to relate his understanding of what Davis had testified to earlier in the trial. When the government objected on the ground that the court's sequestration order had been violated, the following dialogue took place:

> The Court: I'd like to know how he heard that because everyone in this courtroom was instructed not
> --
>
> Mr. Scofield: Because I discussed his testimony with him. I specifically told him about that testimony and told him I was going to ask him about that,

37

Your Honor. I don't think that violates the sequestration order.

The Court: Certainly does.

* * *

The Court: It's very unprofessional. It's an absolute breach of Rule 615, and I don't see how you think you can get by that just because you think you are preparing a witness.

Mr. Scofield: Well, I have to ask him about it. I want to ask him about it on direct.

Government Attorney: Seems to me the proper way to prepare the witness is the way the government prepared. We ask what they know. We don't tell them what went on in the courtroom.

The court thereupon struck Alexander's testimony.

Following the afternoon recess, Scofield approached the bench and acknowledged a violation of the Rule:

Your Honor, as I told you in chambers, I now realize that the proper thing for me to do in interviewing Alexander and preparing him to testify was that I could have asked him all the details of whether he had been a dealer and whether he had done drug deals with Michael Rhynes and that sort of thing without telling him that Davis had said that he had done that.

Scofield then explained that he had related the government witness' testimony to Alexander in order to elicit Alexander's response to it. He also proffered the remainder of Alexander's testimony. The court thereupon concluded:

38

I am not going to revisit that issue. And I would have to say that your proffer about all the information that Mr. Alexander has about witnesses who have testified in this trial would certainly lead this judge to conclude that my Rule 615 order was violated as to the testimony of many witnesses.

\* \* \*

[T]he only thing you lose is the testimony of this witness, who has been obviously coached on testimony that's been given in this courtroom under a separation of witness rule. And that is wrong, sir.

The sanction is reasonable under the circumstances. I've held the government's feet to the fire, and it was the defense that suggested that the government observe that ruling at the beginning of the trial.

Scofield thereafter assured the court that he violated the order only in repeating to Alexander the testimony of government witness Davis.

The sole question raised on this appeal en banc is whether the district court's exclusion of Alexander's testimony constituted reversible error. The plurality would hold that Rule 615 does not prohibit counsel for the parties from discussing the testimony of prior witnesses with prospective witnesses because "nothing on the face of [Rule 615] addresses the conduct of lawyers in any way." Ante at 10. The plurality would hold further that the demands of attorney preparation, ethics, and constitutional provisions require that the rule permit attorneys to discuss the testimony of prior witnesses with prospective witnesses in preparing them for trial. It adds that if a witness is inappropriately coached, the remedy is through cross-examination, thus eviscerating, in essence, the proscription of Rule 615 as it applies to attorneys.

The government argues on appeal that the "serious and dangerous nature of this argument cannot be overstated. If attorneys are allowed to conduct themselves in a manner that undermines the purpose of court orders, those orders and our function as `officers of the Court' are rendered meaningless." The government notes that excusing

39

defense counsel from compliance with sequestration orders would subject rulings of trial courts to "the word games so popular in our public life today. We believe this Court should not countenance those games at the expense of justice, truth and the proper functioning of our court system."

For the reasons that follow, I heartily agree with the government's position. The plurality's opinion would be without precedent and would all but render Rule 615 a hollow shell, since attorneys try virtually all cases in which a Rule 615 order is imposed. Under the plurality's holding, attorneys could legally undermine sequestration orders simply by acting as "go-betweens," relating to prospective witnesses what has already been testified to by other witnesses.

II

The operative language of Federal Rule of Evidence 615 reads: "At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion." This rule is designed to discourage and expose fabrication, inaccuracy, and collusion by limiting the ability of one witness to shape his testimony to match that given by other witnesses at trial. See Opus 3 Ltd. v. Heritage Park, Inc., 91 F.3d 625, 628 (4th Cir. 1996). The rule is one of the most important trial mechanisms for reaching truth. Indeed, it is recognized that the sequestration of witnesses is "one of the greatest engines that the skill of man has ever invented for the detection of liars in a court of justice." Id. (quoting 6 John Henry Wigmore, Wigmore on Evidence § 1838, at 463 (James H. Chadbourn ed., 1976)). The mechanism is not a creation of Rule 615, but represents the wisdom of the ages. In the book of Susanna, in the Apocrypha, Susanna of Biblical times was charged with adultery, for which the penalty was death. Daniel, suspecting complicity between the two prosecutorial witnesses, issued this order: "Separate [the witnesses] far from each other, and I will examine them." Apocrypha, Susanna, v. 51 (New Rev. Standard Version). When the process revealed material discrepancies in the witnesses' stories, Susanna was acquitted and the witnesses were beheaded for giving false testimony. Professor Wigmore, characterizing the pedigree and importance of the sequestration rule, states, "There is perhaps no testimonial expedient which, with as long a history, has

40

persisted in this manner without essential change." 6 <u>Wigmore on Evidence</u> § 1837, at 457.

While the express directive of Rule 615 -- that witnesses be "excluded so that they cannot <u>hear</u> the testimony of other witnesses" -- suggests most immediately the exclusion of witnesses from the courtroom, it has always been understood also to preclude the discussion among witnesses of testimony that has taken place in the courtroom. Common sense commands that if a rule prohibits a witness from "hearing" the testimony of other witnesses, the prohibition is violated if the testimony of a prior witness is repeated and heard in the courthouse corridor or outside on the street. As Professor Wigmore points out, a sequestration of witnesses of necessity includes requirements that (1) prospective witnesses not consult with each other; (2) one witness not listen to the testimony of another; and (3) a witness who has left the stand not consult with a prospective witness. <u>See</u> 6 <u>Wigmore on Evidence</u> § 1840, at 471.**1** While Professor Wigmore recognizes that a trial judge may relax these requirements in the court's discretion, he admonishes that "nothing should sanction any indirect method of conveying to the prospective witnesses information of the testimony already given. For example, it would seem obvious to good sense that the perusal of journals reporting the testimony should be forbidden." <u>Id</u>. at 471-72.

_____

**1** Judge King suggests an absence of any authority for the proposition that when Rule 615 is invoked, "a witness [is prohibited] from <u>hearing</u>, in any form whatsoever, anything contained in a prior witness's testimony." <u>Ante</u> at 10 n.6. As I further develop this point below, I note at this point, only to respond to Judge King, that Rule 615 itself provides for sequestration "so that [witnesses] cannot <u>hear</u> the testimony of other witnesses." Fed. R. Evid. 615 (emphasis added). While the purpose of Rule 615 in preventing witnesses from "hearing" the testimony of prior witnesses is not limited in the Rule to any particular location, were there any doubt, our own precedent holds that "hearing" includes the reading of testimony outside of the courtroom. <u>See United States v. McMahon</u>, 104 F.3d 638 (4th Cir. 1997). This is a universally understood reading of the Rule. <u>See</u>, e.g. <u>Perry v. Leeke</u>, 488 U.S. 272, 281 (1989); <u>Miller v. Universal City Studio, Inc.</u>, 615 F.2d 1365, 1373 (5th Cir. 1981); <u>State v. Steele</u>, 359 S.E.2d 558, 562 (W. Va. 1987).

41

Even the plurality acknowledges that the sequestration of witnesses under Rule 615 requires that witnesses "not discuss the case among themselves or anyone else . . . ." Ante at 11. Indeed, the Supreme Court has recognized this prohibition not only as "common practice," but also as a "corollary" of Rule 615. Perry v. Leeke, 488 U.S. 272, 281 (1989). The Court noted that the rule is enforced "to lessen the danger that [witnesses'] testimony will be influenced by hearing what other witnesses have to say, and to increase the likelihood that they will confine themselves to truthful statements based on their own recollections." Id. at 281-82. Thus, the common understanding is that the prohibition against "hearing" what other witnesses have stated in the courtroom extends to the learning of testimony outside of the courtroom. We explicitly recognized this in United States v. McMahon, 104 F.3d 638 (4th Cir. 1997), where we upheld the contempt conviction of a witness, who was subject to a Rule 615 sequestration order, for reading daily trial transcripts and sending his secretary to the courtroom to find out what was transpiring. The order in McMahon was the most simple invocation of Rule 615: "The Government's motion to sequester the Defendant's witnesses will be granted, and the Defendant's witnesses will be excluded from the courtroom." 104 F.3d at 640; see also Miller v. Universal City Studios, Inc., 650 F.2d 1365, 1373 (5th Cir. 1981) (holding that Rule 615 prohibits the reading of trial transcripts); State v. Steele, 359 S.E.2d 558, 562 (W. Va. 1987) (listening to "mechanical recordings" of courtroom testimony violates sequestration order). As the Fifth Circuit explained in Miller, "The opportunity to shape testimony is as great with a witness who reads trial testimony as with one who hears the testimony in open court." 650 F.2d at 1373.

While the plurality does not seem to take issue with the notion that Rule 615 prohibits one witness from speaking with another witness or with anyone else, it would hold that a witness may discuss with an attorney the testimony of another witness: "This Rule's plain language relates only to `witnesses' . . . . Thus, Rule 615 did not prohibit Mr. Scofield from discussing D. S. Davis's testimony with Corwin Alexander." Ante at 10. As the plurality observes, "nothing on the face of [Rule 615] addresses the conduct of lawyers in any way." Ante at 10.

This observation is remarkable in two respects. First, a rule that prohibits a witness from "hearing" the testimony of other witnesses

42

must include a prohibition against hearing that testimony not only from another witness directly but also through intermediaries. This is a necessary conclusion, as the plurality acknowledges. And second, if Rule 615 precludes a person from acting as an intermediary to relate to one witness the testimony of another, how can we exempt an attorney from the proscription? Just as a discussion among witnesses outside the courtroom would frustrate the rule that one witness cannot hear the testimony of another, a discussion between a witness and an attorney about another witness' testimony frustrates the rule. This is the specific holding of the Fifth Circuit in Jerry Parks Equip. Co. v. Southeast Equip. Co., Inc., 817 F.2d 340 (5th Cir. 1987). In that case, the party and its counsel met with the witness during lunchtime. The court not only found a violation of Rule 615, but also, because the party's attorneys were involved, upheld the district court's exclusion of the witness' testimony. See id. at 342-43. The Supreme Court cited this case with approval in Perry v. Leeke, invoking it as an example of the "common practice" under Rule 615 and summarizing it as involving the "improper discussion of [a] case by defense witness with defense counsel." 488 U.S. at 281 & n.4.

Thus, while the plurality seems to endorse an interpretation of Rule 615 that would prohibit witnesses from discussing testimony among themselves or with anyone else, it maintains that the "someone else" does not mean an attorney and that somehow an attorney has a license to violate the proscription and frustrate the rule. Stated otherwise, while two witnesses are prohibited from discussing testimony with each other directly, they may conduct such a discussion through the ears and mouth of an attorney. This conclusion is neither logical nor supported by precedent.**2**

_____

**2** In a separate opinion, Judge Luttig agrees, arguing that attorneys in a case subject to a Rule 615 sequestration order are prohibited only "in spirit" from acting as a "go-between" two witnesses -- one who has testified and the other who is about to testify. He argues that the district court's order that "witnesses shall not discuss one with the other their testimony" is not addressed to attorneys and therefore permits a practice by which an attorney can act as the eyes and ears of communication between witnesses. I would reject this practice not only as directly violative of the court's order but also as contumacious.

To be sure, the cases and text relied upon by the plurality acknowledge that attorneys may discuss "the case" with witnesses, but this observation does not suggest that the attorneys may, in the face of a sequestration order, relate to a prospective witness the <u>testimony</u> that a prior witness has given. The plurality rationalizes its attorney exception on three bases. First, "[t]horough preparation demands that an attorney interview and prepare witnesses before they testify. No competent lawyer would call a witness without appropriate and thorough pre-trial interviews and discussion." <u>Ante</u> at 14. But it does not follow from this observation that an attorney cannot fulfill this duty of diligence without violating a sequestration order. The attorney may review facts and arguments with the witness, but the attorney should not be complicit in shaping testimony and matching it with the testimony of other witnesses.

Second, the plurality suggests that the attorney in this case "had ethical (and possibly constitutional) duties to investigate [Davis'] allegations with Alexander before he put Alexander on the stand." <u>Ante</u> at 15. Again, however, the attorney could have fulfilled those duties by asking Alexander what he knew of the events about which he was going to testify. But relating to Alexander the testimony of a prior witness allowed Alexander to "hear" the testimony of that prior witness, directly in violation of Rule 615.

Finally, acknowledging that an attorney exception to Rule 615 would permit attorneys to "coach" witnesses, the plurality seeks to provide assurance by identifying other truth-seeking mechanisms: "[I]f an attorney has inappropriately `coached' a witness, thorough cross-examination of that witness violates no privilege and is entirely appropriate and sufficient to address the issue." <u>Ante</u> at 16.

The lofty purpose of Rule 615 deserves greater deference than it would be given if it were allowed to be engulfed by an attorney exception for trial preparation. And the rule is forfeited altogether by arguing that even though the truth-seeking purpose of Rule 615 might be debased by an attorney exception, cross-examination will fill the gap. The rule is given, and we ought to enforce it. And it is totally inconsistent with the "common practice" under the rule to allow an attorney to tell a prospective witness what a prior witness has said on the witness stand. The attorney in this case heard the order from the

44

court, and by telling a prospective witness about the testimony of a prior witness, the attorney directly violated the court's order.

III

For the reasons given by Chief Judge Wilkinson, I find that the district court's order excluding the testimony of Alexander did not constitute an abuse of discretion. See Jerry Parks , 817 F.2d at 342-43. Accordingly, I would affirm.

I am authorized to indicate that Chief Judge Wilkinson joins in this opinion and that Judge Traxler joins in Parts I and II of the opinion affirming a violation of the district court's sequestration order.

45